**Joseph BIEHUNIK et al., Plaintiffs-Appellees,**

**v.**

**Frank N. FELICETTA, Commissioner of Buffalo Police Department, Thomas R. Blair, Deputy Commissioner of Buffalo Police Department, Howard R. Wheeler, Inspector, Buffalo Police Department, Charles DeVoe and Karl Muehlbauer, both Captains of the Buffalo Police Department, Defendants-Appellants.**

**No. 490, Docket 35543.**

United States Court of Appeals, Second Circuit.

Argued March 5, 1971.

Decided March 5, 1971.

Certiorari Denied June 21, 1971.
See 91 S.Ct. 2256

Anthony Gregory, Asst. Corp. Counsel (Anthony Manguso, Corp. Counsel, Buffalo, N. Y., on the brief), for appellants.

William B. Mahoney, Buffalo, N. Y., for appellees.

Before LUMBARD, Chief Judge, KAUFMAN and ANDERSON, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

This appeal presents another aspect of the continuing problem of reconciling the state's powers as employer with the constitutional protections its employees enjoy as citizens. The Buffalo Police Commissioner, Frank Felicetta, commanded 62 city policemen, upon pain of discharge, to appear in a lineup for possible identification by civilians who allegedly had been assaulted by certain patrolmen. The District Court permanently enjoined the lineup. For the reasons set forth below, we reversed the judgment in open court following oral argument and ordered that the mandate issue forthwith.

I.

At approximately 8:30 in the evening of April 6, 1970, patrolling policemen close to 476 Sycamore Street came under gun fire, allegedly from a sniper positioned in the building. Reinforcements were quickly called in by radio to assist in suppressing the fire. Soon thereaf-

ter, between 10 and 25 officers entered the building to apprehend the suspected gunman. Complaints shortly received by the Commissioner charged that several members of this squad burst unannounced into occupied apartments of the building and without justification beat the inhabitants severely, requiring hospitalizations in several instances.

Commissioner Felicetta pursued his investigation of the complaints by assembling the names, 62 in number, of policemen who were on duty in the vicinity of 476 Sycamore Street on the night in question. Several days later, a few complainants were permitted to view photographs of the 62 officers. Apparently because of the age of the photographs,[1] the resulting identifications proved untrustworthy. After further consultation with the complainants and discussion with Buffalo's Corporation Counsel, the Commissioner on May 27 issued a series of orders to his subordinate officers directing the 62 policemen to report to the Police Academy in their usual duty dress at 6:00 p. m. on June 3, 1970. The order concluded:

> These arrangements are made for the purpose of staging a lineup so that identification can possibly be made in connection with an incident which occurred at 476 Sycamore Street on April 6, 1970. Because there is the

possibility of resulting criminal prosecutions, you will notify each officer so ordered that he has the right to be represented by counsel and/or P.B.A. representative at this lineup. In addition, you will notify each officer that he is entitled to exercise all rights pursuant to the Miranda decision as set forth by the U.S. Supreme Court.

The policemen promptly instituted this civil rights action, alleging that the lineup would deprive them of various constitutional rights. 28 U.S.C. § 1343; 42 U.S.C. § 1983. The District Court thereupon issued an *ex parte* temporary restraining order shortly before noon on June 3 enjoining the lineup.[2] Commissioner Felicetta apparently agreed not to conduct the lineup during the suit's pendency, and on August 20 a permanent injunctive order was entered.

## II.

■ As we perceive it, the principal ground for Judge Henderson's injunction is that the compulsory presence of the 62 officers at the Police Academy would have constituted a "seizure" of their persons, unsupported by an arrest warrant or probable cause to arrest. It is conceded by the Commissioner that he had no reasonable basis for believing that all 62 officers had committed a crime or that probable cause to take

---

1. The photographs shown were removed from police personnel files; most had been taken at the time the officer joined the police force.

2. In addition to the reasons stated in the text for our summary reversal in open court of this extraordinary injunction, we note that the procedure in granting the *ex parte* temporary restraining order on June 3, 1970 was highly irregular. At argument it was conceded that no notice of the application was given to the Buffalo Police Department. The police headquarters are located close to the federal courthouse, and no reason whatever was given for failing to give such notice. The district courts should scrupulously observe the clear requirement of Rule 65 (b) of the Federal Rules of Civil Procedure, that "[a] temporary restraining order may be granted without written or oral notice to the adverse party or his attorney only if * * * it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition * * *." As we have stated in prior opinions, it will be very rare indeed when the issuance of such an order without notice will be justified, since normally, within a brief period of time and without much difficulty, the opposing parties and their counsel can be notified of the application by telephone and can appear before the district court. See Austin v. Altman, 332 F.2d 273, 275 (2d Cir. 1964); Arvida Corp. v. Sugarman, 259 F.2d 428, 429 (2d Cir. 1958) (Lumbard, J., concurring).

them into custody existed. Nor do we question on this appeal that the compelled appearance at the lineup can be considered a "seizure" of the officers within the purview of the Fourth Amendment. A person's ability to pursue lawful activities of his own choosing without official interference can be as abruptly infringed by an authoritative command to present oneself as by a policeman's hand on the shoulder or handcuffs on the wrist. Cf. Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L. Ed.2d 676 (1969); Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed. 2d 889 (1968) ("It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person.")

Nor do we take issue with plaintiffs' premise that the Constitution protects policemen as fully as other citizens. They, "like teachers and lawyers, are not relegated to a watered-down version of constitutional rights." Garrity v. United States, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

The plaintiffs would have us end our inquiry at this point. They would have us say that to "arrest" a policeman, like any other citizen, without probable cause is an unreasonable seizure, and hence outlawed by the Fourth Amendment. In the familiar criminal arrest context, the reasonableness of a seizure of the person is indeed usually measured by the existence *vel non* of probable cause. But we cannot accept the contention that this principle, well established as it may be, must be applied inflexibly even in cases far removed from the criminal arrest arena.

In a series of recent decisions the Supreme Court has confirmed the obligation of the courts in such atypical cases to undertake the familiar task of weighing the governmental interest in the particular intrusion against the offense to personal dignity and integrity. In Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), and See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943

(1967), the Court considered the reasonableness of area-wide health inspections under the Fourth Amendment. Noting that these vital programs would be crippled if the customary showing of probable cause were required, and that such inspections normally do not infringe privacy as severely as the characteristic criminal search, the Court approved the issuance of inspection warrants on a far less stringent showing of need. In the following term, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), applied a similar analysis in upholding a limited stop and frisk seizure and search made without probable cause or warrant, where the officer had reason to believe that the suspect was armed and dangerous. Finally, in Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), the Court strongly suggested that probable cause would be no prerequisite to compelling (under some sort of judicial control) a citizen to report to the station house for the narrow purpose of obtaining fingerprints.

### III.

Set against this background, the question before us becomes whether upon a balance of public and individual interests, the order to plaintiffs to report to the lineup was reasonable under the particular circumstances, even though unsupported by probable cause.

Decisive to our conclusion that the lineup was indeed "reasonable" is the substantial public interest in ensuring the appearance and actuality of police integrity. We do not believe that the public must tolerate failure by responsible officials to seek out, identify, and appropriately discipline policemen responsible for brutal or unlawful behavior in the line of duty, merely because measures appropriate to those ends would be improper if they were directed solely toward the objective of criminal prosecution. A trustworthy police force is a precondition of minimal social stability in our imperfect society, a fact repeatedly dramatized by tragic incidents of violent conflict between police

and some groups of civilians that continue to break out periodically in so many of our cities. Moreover, it is a correlative of the public's right to minimize the chance of police misconduct that policemen, who voluntarily accept the unique status of watchman of the social order, may not reasonably expect the same freedom from governmental restraints which are designed to ensure his fitness for office as from similar governmental actions not so designed. The policeman's employment relationship by its nature implies that in certain aspects of his affairs, he does not have the full privacy and liberty from police officials that he would otherwise enjoy. So long as the actions of a policeman's superior remain within reasonable bounds, there can hardly be that affront to expectations of personal autonomy which marks the state's coercive power in the typical arrest case.

Thus that plaintiffs are not only citizens protected by the Constitution but also policemen is relevant in two respects. Their status both heightens the public interest served by the planned lineup and lessens the adverse impact of the investigation on the plaintiffs' legitimate interest in personal autonomy.

We should not, of course, be understood as suggesting that policemen will be required to tolerate invasions of their freedoms which are not reasonably related to the special considerations arising from their relationship of employment. Policemen do not abandon their constitutional rights upon induction into the department. The facts before us on this appeal, however, do not require that we precisely delineate the outer bounds of reasonableness in investigations of suspected police misconduct, for this is not a doubtful case.

The lineup was ordered by that official of the police department charged with running an efficient and law-abiding organization—the Police Commissioner—and was clearly and highly relevant to the legitimate end of assuring his employees' trustworthy performance of their assigned tasks.[3] Commissioner Felicetta's reference in his order directing the lineup to a possible criminal prosecution did not dilute the potential usefulness of the lineup in administering disciplinary measures.[4] We therefore need not consider at this time the propriety of enjoining a similar lineup conducted exclusively with criminal prosecution in mind.[5] Finally, the lineup was to be conducted at a time and place that were well within the usual demands of a policeman's job.[6]

3. Compare United States v. Blok, 88 U.S. App.D.C. 326, 188 F.2d 1019 (1951) (search of government employee's desk for evidence of unrelated petty larceny held not reasonable), with United States v. Collins, 349 F.2d 863 (2d Cir. 1965), cert. denied, 383 U.S. 960, 86 S.Ct. 1228, 16 L.Ed.2d 303 (1966) (search of customs employee's jacket for evidence of on-the-job theft of customs goods held reasonable). Cf. Gardner v. Broderick, 392 U.S. 273, 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (dismissal of public employee for refusal to answer "questions specifically, directly, and narrowly relating to the performance of his official duties" not barred by fifth amendment); Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 392 U.S. 280, 284, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (same).

4. Equally unconvincing is the mere fact that no formal disciplinary proceedings had begun prior to the scheduled lineup;

it may well have been entirely proper to defer such proceedings until identifications had been made.

5. See United States v. Hagarty, 388 F.2d 713, 717 (7th Cir. 1968) (eavesdropping of public employee's office not "made in an effort to supervise and investigate * * * but was designed to detect criminal activity * * *."). And compare Moore v. Student Affairs Committee of Troy State University, 284 F.Supp. 725 (M.D.Ala.1968) (fruits of joint warrantless search of college dormitory room by dean and police admissible in expulsion proceeding), with Piazzola v. Watkins, 316 F.Supp. 624 (M.D.Ala.1970) (fruits of identical search inadmissible in criminal proceeding).

6. Compare United States v. Blok, 88 U.S. App.D.C. 326, 188 F.2d 1019 (1951) (search of government employee's desk unreasonable where desk permitted to be used for private storage) with United

Under these circumstances, to forbid defendants to proceed with the lineup would unduly hamper police officials in their difficult task of supervising and maintaining a dependable and trusted police force, with little compensating gain to plaintiffs' individual rights.[7]

States v. Donato, 269 F.Supp. 921 (E.D. Pa.), aff'd mem., 379 F.2d 288 (3d Cir. 1967) (search of mint employee's locker reasonable where lockers were regularly inspected for sanitary reasons, and regulation expressly negated private use).

7. The District Court also found relevant to its determination of reasonableness the likelihood that the 62 policemen would be presented without additional men known to be innocent, or, in the event that sufficient decoys were added, that the proceedings would "resemble a circus." We have not been cited to any constitutional requirement that any proportion of a lineup consist of men known to be innocent. A lineup consisting only of the 62 policemen would not be "so impermissibly suggestive and conducive to irreparable mistaken identification [as to deny] due process of law," Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), because of the 62 no more than 10 were accused of illegal assault. And it was in any case a clear abuse of the federal District Court's discretion, when asked to enjoin local police investigations, to assume that they would be conducted in an unconstitutional manner in the absence of specific proof.

We note also that the policemen were explicitly notified of their right to have counsel present. See United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). And no waiver of legal objections to any aspect of the proceedings was demanded. See Gardner v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (waiver of fifth amendment rights); Uniformed Sanitation Men Ass'n v. Commissioner of Sanitation, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968) (same).