27555.   CREAMER v. THE STATE.

512

ARGUED SEPTEMBER 25, 1972—DECIDED SEPTEMBER 26, 1972—
REHEARING DENIED OCTOBER 5, 1972.

514

*McDonald, Dupree, Rodriguez & Moore, Duard R. Mc-Donald, Hylton B. Dupree, Jr., John H. Moore,* for appellant.

*Ben F. Smith, District Attorney,* for appellee.

NICHOLS, Justice. 1. The issue in a habeas corpus proceeding is the legality of the present confinement of the petitioner. See *Lewis v. Smith,* 227 Ga. 220 (179 SE2d 745); *Patterson v. Smith,* 227 Ga. 170 (179 SE2d 247). There being no evidence submitted showing that the confinement of the defendant was illegal per se and there being no evidence that his confinement was cruel and unusual, the judgment of the trial court denying the writ of habeas corpus was not error.

2. The remaining issues in the case all turn upon the question of whether it would, under the facts in this case, violate the rights of the defendant for the State to remove the bullet from his body.

Under the decision of the United States Supreme Court in Schmerber v. California, 384 U. S. 757 (86 SC 1826, 16 LE2d 908), the removal of the bullet would not be a violation of any of the defendant's rights guaranteed by the Constitution of the United States. The court in the Schmerber case dealt extensively with each assertion made by the defendant here and concluded that blood could be taken for chemical analysis under the circumstances of that case,

that the Fifth Amendment refers to the right "to remain silent unless he chooses to speak in the unfettered exercise of his own will" (p. 763), and that the Fourth Amendment, dealing with unreasonable search and seizure, did not prohibit the extraction of blood through an opening in the body made with the State's needle by a physician in a medical environment under circumstances where probable cause existed. In concluding its opinion it was stated: "It bears repeating, however, that we reach this judgment only on the facts of the present record. The integrity of an individual's person is a cherished value of our society. That we today hold that the Constitution does not forbid the States minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions."

Based upon the uncontradicted evidence in this case the removal of the bullet from the defendant's body would amount to a minor intrusion into his person and would not be violative of his rights under the Constitution of the United States. Accordingly, the judgment of the trial court overruling these contentions of the defendant was not error.

3. We now reach the question of whether the defendant's rights under the Constitution of the State of Georgia and statutory law would be violated by the removal of the bullet.

As counsel for the defendant states, Georgia has long granted more protection to its citizens than has the United States and that while the States cannot grant less protection they can grant more.

Article I, Section I, Paragraph VI of the Constitution of 1945 states: "No person shall be compelled to give testimony tending in any manner to criminate himself." *Code Ann.* § 2-106.

The Act of 1962 (*Code Ann.* § 38-416) provides: "No person, who shall be charged in any criminal proceeding with the commission of any indictable offense or any offense punishable on summary conviction, shall be compellable to

give evidence for or against himself." Ga. L. 1866, pp. 138, 139; 1962, pp. 133, 135.

While the language in the United States Constitution has long been construed to be limited to "testimony," the Georgia Constitution has been construed to limit the State from forcing the individual to present *evidence,* oral or real.

In one of the latest opinions of this court on this subject it was held in a full bench opinion: "This leaves for decision only whether or not 'testimony' as found in the Constitution embraces all kinds of evidence? Fortunately, this court has many times decided that question by holding that the word 'testimony' means all types of evidence as the following decisions will illustrate. In *Day v. State,* 63 Ga. 667 (2), it was said: 'Evidence that a witness forcibly placed defendant's foot in certain tracks near the scene of the burglary, and that they were of the same size, is not admissible. A defendant can not be compelled to criminate himself by acts or words.' At page 669, the clause of the Constitution is quoted, and then it is said: 'Nor can one, by force, compel another, against his consent, to put his foot in a shoe-track for the purpose of using it as evidence against him on the criminal side of the court.' Dealing with the same facts this court in *Elder v. State,* 143 Ga. 363 (85 SE 97), followed the ruling in the *Day* case, supra, and *Evans v. State,* 106 Ga. 519 (32 SE 659, 71 ASR 276).

"An extensive discussion of this question is found in *Calhoun v. State,* 144 Ga. 679 (87 SE 893). There the Constitution is quoted and it is then said at page 680: 'Its prototype is found in the maxim of the common law, nemo tenetur seipsum accusare, that no man is bound to accuse himself of any crime or to furnish any evidence to convict himself of any crime; and this was brought by our ancestors to America as a part of their birthright. *Marshall v. Riley,* 7 Ga. 367, 370.' It was then said at page 681 that: 'The constitutional guaranty protects one from being compelled to furnish evidence against himself, either in the form of oral confessions or incriminating admissions of an involuntary character, or of *doing an act* against his will which is

incriminating in its nature.' . . . That opinion recognized the rule then of force that evidence illegally obtained by search was admissible but said it was distinctly different from the rule that any evidence produced by the accused under compulsion was inadmissible.

"The foregoing and many more decisions of this court had construed the word 'testimony' to embrace any evidence when the identical clause containing this word was written into the 1945 Constitution. The universal rule of construction requires a holding that the framers of that Constitution intended for it to have the meaning theretofore given it by construction." *Aldrich v. State,* 220 Ga. 132, 134 (137 SE2d 463).

How does the judgment in this case ordering the removal of the bullet compare with that in *Aldrich* and the cases cited therein?

In each of those cases the defendant was required to perform some act, drive a truck upon scales, place his foot in a shoe track, etc., and, as emphasized in that case, the "doing of an act" against his will to incriminate himself.

Under the argument presented by able counsel for the defendant, fingerprints could no longer be taken, photographs or line-ups could not be legal, nor could a prisoner be directed to appear during a trial for identification purposes.

In each instance the prisoner is forced to submit so that evidence may be produced *from him,* but he is only required to be present and the evidence is adduced by those fingerprinting, photographing or identifying him. In *Springer v. State,* 121 Ga. 155 (48 SE 907) the forcing of the defendant to "do an act" as compared with "taking evidence from him" was distinguished. You cannot force a defendant to act, but you can, under proper circumstances, produce evidence from his person.

It has long been held that evidence taken from an accused is admissible in Georgia where not compelled by illegal arrest. Compare *Evans v. State,* 106 Ga. 519 (32 SE 659), where the evidence was not admissible where compelled during illegal arrest; *Drake v. State,* 75 Ga. 413,

where clothing taken from the defendant was admissible; *Hill v. State,* 161 Ga. 188 (129 SE 647), where "beggar lice" were discovered on the underclothes of the accused when he removed his outer clothing while under arrest and such evidence was held admissible; *Johns v. State,* 180 Ga. 187 (178 SE 707), where shoes were taken from the accused while under arrest and compared with shoe prints; *Meriwether v. State,* 63 Ga. App. 667 (11 SE2d 816), where the accused was forced to appear in a line-up for the purpose of identification.

In the case sub judice the defendant is forced to submit his body for the purpose of having the evidence removed. He is not forced to himself remove it and therein lies the distinction in this case from the *Aldrich* case and similar cases.

Having distinguished such cases the last remaining question is whether under the facts in this case the search is reasonable.

The defendant was represented by counsel and a full evidentiary hearing was held to determine probable cause as to the fact of a bullet being imbedded in the defendant's body and as to whether there was probable cause to believe that it was connected with the murders. This hearing also included evidence as to any danger to the defendant's life or limb.

It cannot be said that under the evidence adduced that there was not probable cause both as to the fact that the bullet was in the defendant's body and that it was connected with the murders. Nor can it be said under the uncontradicted evidence of the physician that the trial court was not authorized to find that the defendant's life and limb would not be harmed by the removal of such bullet.

Under the facts in this case the judgment of the trial court ordering the removal of the bullet in the present case under the direction of the chief surgeon at the Talmadge Memorial Hospital, Augusta, Georgia was not error.

Accordingly, the judgment of the trial court must be affirmed, and the supersedeas previously granted vacated.

*Judgment affirmed. All the Justices concur, except Gunter, J., who dissents from Division 3 of the opinion and the judgment of affirmance.*

GUNTER, Justice, dissenting. James Edward Creamer, the accused, filed a motion in this court on September 20, 1972, seeking to stop the carrying out of an order entered in the trial court on September 19, 1972. The order of the trial court required the accused to submit to a surgical operation for the removal of a foreign substance from his body believed to be a bullet. Upon presentation of the motion this court temporarily stopped the carrying out of the trial court's order and directed counsel for the accused and the State to present argument to the full court with respect to the motion on September 25, 1972. Having heard argument orally and by briefs, this court now proceeds to its decision on the motion.

The record shows that on August 31, 1972, the accused was brought from Fulton County, where he was confined for an offense unrelated to the charges against him in , Cobb County, by law enforcement officers to Cobb County. On September 1, 1972, two warrants were issued by the Judge of the State Court of Cobb County charging the accused with having committed two murders in Cobb County in May of 1971. On September 1, 1972, the Judge of the Superior Court of Cobb County also issued a search warrant which provided, in part, as follows: "The sheriff and/or his lawful deputy of Cobb County, Georgia, is hereby directed to cause the said James Edward Creamer to appear before me on the 7th day of September, 9:30 a.m., 1972, and at that time the defendant is to show cause before me why he should not be examined to determine if a bullet is located in his body and for such other examination and medical and surgical procedure that the court may hereafter order. . . It is further ordered and directed that the said James Edward Creamer be examined by Dr. Robert T. Session, Dr. James H. Manning and Dr. Spencer G. Mullins, and that they shall determine whether the health of the said James Edward Creamer shall be

substantially impaired by the removal of said .38 calibre bullet and that they shall report their findings to this court as soon as possible."

The accused was also brought before the Judge of Superior Court of Cobb County on September 1, 1972, his constitutional rights were properly explained to him, and counsel was appointed for him by the court pending the arrival of the accused's own personal attorney.

On September 7, 1972, attorneys for the accused filed several motions with the court as follows: (1) Asking that a writ of habeas corpus issue; (2) Seeking to strike and suppress all statements theretofore made by the accused and any and all information obtained from the accused in any way including an inspection of his person by law enforcement officers; (3) Seeking to quash the application for search warrant and affidavits supporting it; (4) Seeking injunctive relief restraining any person from examining the body of the accused against his objection and seeking to enjoin any person from any instrusion, by any means whatsoever, into the body or person of the accused against his objection.

On September 8, 1972, the trial judge overruled these motions and further ordered "that James Edward Creamer submit to an examination and X-ray under the control, direction and supervision of the Chief of Staff of Surgery, Cobb General Hospital, S. G. Pausa, M. D., forthwith and that a report be made to the court as to whether the removal of the bullet can be effected without endangering his life and that a report of the procedures necessary to effect such removal be forthwith made to the court, all at the expense of Cobb County; that the district attorney make proper return of the execution of this order as provided for search warrants."

The examination of the accused was thereafter made by the physicians, and they made their report to the court.

On September 19, 1972, the trial judge then entered the order appealed from. That order recited that the physicians had reported that there is a lead or steel substance in the defendant's chest, and that there would be no significant

danger to the defendant's life or health in performing an operation for the removal of the substance from his body. The order then concluded as follows: "It is therefore ordered that the defendant, James Edward Creamer, be transported by the Sheriff of Cobb County, Georgia, to Talmadge Memorial Hospital; and it is ordered that the Chief Sugeon of said hospital cause to be performed the necessary surgery to effect the removal of the bullet or other substance; and it is further ordered that the defendant may have counsel present and a physician of his own choosing if he so desires during the time that the surgery is performed and any examination preliminary thereto or subsequent thereto."

As heretofore related, this court temporarily stopped the carrying out of this order by an order entered September 20, 1972. This court must now rule on the motion for stay. By ruling on this motion this court must necessarily decide the merits of the matter at issue between the accused and the State. If the State can legally require the surgical operation ordered, then the motion must be overruled. If the State can not require the surgical operation ordered, then the motion should be granted, and the trial court's order of September 19, 1972, must be permanently stayed.

It is therefore necessary to proceed to the merits of the matter, namely the legality or illegality of the ordered surgical operation.

I.

Is the order entered below violative of the Fourth Amendment to the Federal Constitution which prohibits unreasonable searches and seizures? It is not. The record shows that the search and seizure to be effected by a surgical operation will not endanger the life or health of the accused. The operation would be a minor one, could be conducted with a local anesthetic, and medical experts have testified that the substance or object could be removed without danger to the accused.

The Fourth Amendment to the Federal Constitution does not prohibit the order entered below.

## II.

Is the order below violative of the Fifth Amendment to the United States Constitution which provides that no person shall be compelled in any criminal case to be a witness against himself? It is not. The Supreme Court of the United States in the case of Schmerber v. California, 384 U. S. 757 (1966) has held that the proscription contained in the Fifth Amendment is a bar against compelled "communications" or "testimony," but that compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate it. The Schmerber case was a "taking of blood" case, and it was a five-four decision. And while Mr. Justice Black in his dissenting opinion in that case said, "to reach the conclusion that compelling a person to give his blood to help the State convict him is not equivalent to compelling him to be a witness against himself strikes me as quite an extraordinary feat," the majority decision is nevertheless the latest interpretation of this constitutional privilege against self-incrimination by our highest court.

The Fifth Amendment to the United States Constitution does not make the order in the case at bar illegal.

## III.

The Georgia Constitution provides: "No person shall be compelled to give testimony tending in any manner to criminate himself." *Code Ann.* § 2-106.

A Georgia statute provides: "No person, who shall be charged in any criminal proceeding with the commission of any indictable offense or any offense punishable on summary conviction, shall be compellable to give evidence for or against himself." *Code Ann.* § 38-416.

What is the meaning of this Georgia constitutional provision and this Georgia statute in the context of the issue to be decided here?

Under its charter as a Colony and under all of its Constitutions the State of Georgia has been ruled by the common law of England except where Georgia statutory enactments abolish or amend the common law.

The late R. Carter Pittman, a member of the bar of this

court, in a very scholarly article in 21 Va. L. Rev. 773, 774 (May, 1935), discussed the origin of the "privilege against self-incrimination": "The Puritan agitation for the privilege against self-incrimination progressed rapidly and with heated intensity from 1637 through the 1650's. Anterior to the commonwealth torture was used as a matter of course in grave accusations at the mere discretion of the King and the Privy Council and with no restraint other than the prerogative of the sovereign.

"The trials of John Lilburn (1637-1645), the trials of the twelve Bishops (1641), King Charles Trial (1649), and Scroop's trial (1660) all illustrate how the privilege against self-incriminations settled into the bed rock of the English Common Law. In the early 1650's this privilege was so well established in the customary law of England that it was never even thought necessary by any English Parliament to pass an act or resolution touching the matter.

"The implications to be found in Wigmore on Evidence, § 2250, and in the case of Twining v. New Jersey, 211 U. S. 78, to the effect that the privilege against self-incrimination was never regarded in England as the constitutional landmark that our own Constitution makers of 1789 regarded it, seems unjustifiable. No constitutional documents came out of the Puritan revolution and the civil convulsion immediately following it. By the time of the English Bills of Rights of 1689, the privilege had become so well established and universally recognized that to have inserted it would have been very much like re-affirming the law of gravitation."

In the early case of *Marshall v. Riley,* 7 Ga. 367, 370 (1849), Mr. Justice Lumpkin, speaking for this court said: "The maxim of the Common Law, nemo tenetur seipsum prodere, that no man is bound to accuse himself of any crime, or to furnish *any* evidence to convict himself of any crime, is founded in great principles of constitutional right, and was not only settled in early times in England, but was brought by our ancestors to America, as a part of their birthright."

In the case of *Calhoun v. State,* 144 Ga. 679, 680 (87 SE

893) (1915), this court said: "The privilege against self-incrimination has been uniformly construed by the courts as giving the citizen protection as broad as that afforded by the common-law principle from which it is derived. [Cits.] The constitutional guaranty protects an individual from being compelled to furnish evidence against himself, either in the form of oral confessions or incriminating admissions of an involuntary character, or of doing an act against his will which is incriminating in its nature."

And as late as 1964 this court, in a unanimous decision rendered in the case of *Aldrich v. State,* 220 Ga. 132, said at p. 134: "This leaves for decision only whether or not 'testimony' as found in the Constitution embraces all kinds of evidence? Fortunately, this court has many times decided that question by holding that the word 'testimony' means all types of evidence as the following decisions will illustrate. [Citing cases and quotations from cases]."

It is therefore clear that this court has consistently held through the years that a person's privilege against self-incrimination embedded in the law of this State under the common law, under the Georgia Constitution, under the Georgia statute, and under the decisions of this court means that the State cannot compel a person to give "any evidence" *in any manner* against himself that tends to incriminate him. The word "testimony" in our constitutional provision has been interpreted to mean "any evidence." Our Statute, *Code Ann.* § 38-416, says that no person shall be compellable to "give evidence" against himself.

Under the law of Georgia the State cannot compel a person to submit to a surgical operation for the removal of a substance or object from his body if such person is accused of a crime, as in this case, and if such person invokes the Georgia constitutional and statutory guaranties against self-incrimination as the accused has done in this case.

The State cannot compel the operation ordered. The order entered below is illegal and in contravention of Georgia law. The motion to stay that order should be granted by this court rather than denied.

The present Solicitor General of the United States in a speech delivered Feb. 5, 1954, said: "A good many efforts have been made to rationalize the privilege, to explain why it is a desirable or essential part of our basic law. None of the explanations is wholly satisfactory. I am going to offer my own attempt to express the reason for the Fifth Amendment, and why I think it is a sound provision of our basic laws, both federal and state.

"I would like to venture the suggestion that the privilege against self-incrimination is one of the great landmarks in man's struggle to make himself civilized. As I have already pointed out, the establishment of the privilege is closely linked historically with the abolition of torture. Now we look upon torture with abhorrence. But torture was once used by honest and conscientious public servants as a means of obtaining information about crimes which could not otherwise be disclosed. We want none of that today, I am sure. For a very similar reason, we do not make even the most hardened criminal sign his own death warrant, or dig his own grave, or pull the lever that springs the trap on which he stands. We have through the course of history developed a considerable feeling of the dignity and intrinsic importance of the individual man. Even the evil man is a human being.

"If a man has done wrong, he should be punished. But the evidence against him should be produced, and evaluated by a proper court in a fair trial. Neither torture nor an oath nor the threat of punishment such as imprisonment for contempt should be used to compel him to provide the evidence to accuse or to convict himself. If his crime is a serious one, careful and often laborious police work may be required to prove it by other evidence. Sometimes no other evidence can be found. But for about three centuries in the Anglo-American legal system we have accepted the standard that even then we do not compel the accused to provide that evidence. I believe that is a good standard, and that it is an expression of one of the fundamental decencies in the relation we have developed between government and man.

"As that old tartar Mr. Justice Stephen J. Field said, 'The essential and inherent cruelty of compelling a man to expose his own guilt is obvious to everyone, and needs no illustration.'" Griswold, The Fifth Amendment Today, pp. 7, 8.

I respectfully dissent.

## ON MOTION FOR REHEARING.

NICHOLS, Justice. The contention has been made that the defendant's Sixth Amendment rights to due process have been violated and that such violation (right to counsel while the physician examined him under court order) vitiated the later judgment ordering the removal of the bullet.

On September 1st, at the original hearing where counsel was appointed until the defendant's own counsel arrived to represent him, the trial court ordered that *until the arrival of defendant's own counsel* no questioning, no examination and no interrogation would take place out of the presence of the temporarily appointed counsel. The order on the September 7th hearing, entered on September 8th, did not provide for counsel to be present. On this same date the trial court ordered that a named doctor be permitted to visit the defendant privately, and under same conditions under which the defendant consulted with his attorneys. At the hearing on September 19th, no questions as to the defendant's Sixth Amendment rights were raised, although he was represented by counsel at this, as well as all prior hearings. Accordingly, this question is not properly before the court. See *Mitchum v. Stynchcombe.* 227 Ga. 226 (3) (179 SE2d 919); *Brackett v. State,* 227 Ga. 493 (2) (181 SE2d 380); *Ford v. Herbermann,* 227 Ga. 751 (183 SE2d 204).

However, the examination by the physicians appointed by the court was not such an interrogation as to come within the mandate of decisions exemplified by Powell v. Alabama, 287 U. S. 45 (53 SC 55, 77 LE 158, 84 ALR 527) and United States v. Wade, 388 U. S. 218 (87 SC 1926, 18 LE2d 1149).

No question concerning the defendant's guilt or innocence of the crime was asked or answered, and no evidence of an

incriminating nature was obtained as a result of such examination. Evidence of the defendant having previously been administered a local anesthetic was obtained, as well as a consent to the examination, but this evidence was not incriminating in nature.

The examination by the physician would fall within the exceptions laid by the U. S. Supreme Court in Wade, supra, where it is not necessary to have an attorney present. As was there held (p. 227), the Sixth Amendment rights do not apply to "systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like. We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial."

The holding in Wade, supra, and similar cases precludes the use of tainted evidence, but does not preclude the defendant from being tried upon legally obtained evidence.

While the bullet may incriminate the defendant when removed, the question as to its safe removal is a distinct issue which in no wise incriminates him, and the absence of counsel during the examination to determine if it could be safely removed did not violate any Sixth Amendment rights.

The physician who made the examination was subjected to cross examination and the defendant was not precluded from presenting his own expert testimony; and even if such question had been properly presented to this court for decision, this would not require a reversal.

*Rehearing denied. All the Justices concur, except Gunter, J., who dissents.*

GUNTER, Justice, dissenting. My original dissenting opinion treated only the substantive issue in this case: Whether the State can or can not compel a surgical search and seizure operation upon and into the physical body of one accused of a crime in order to seize evidence impacted in the physical body that may be relevant to the crime alleged to have been committed. I gave no consideration in that dissent to a lack of procedural due process.

On motion for rehearing the movant has brought this additional contention plainly and clearly to the attention of this court. Therefore, it must be honestly dealt with.

I am of the opinion that the surgical search and seizure order of the trial court entered on September 19, 1972, is not only in violation of the substantive law of Georgia, but I am also convinced that it is infected with a lack of procedural due process in violation of the Georgia Constitution and the Federal Constitution.

On September 1, 1972, the accused was brought before the trial judge who informed him that two warrants for murder had been issued against him; the accused was advised of his constitutional rights; an attorney was appointed to represent him. Page 7 of the transcript of that hearing reveals that the court advised Mr. McDonald, the attorney appointed for the accused, as follows: "Mr. McDonald, I want the sheriff to serve him [the accused] with a copy of search warrant that I have issued, setting forth a show cause, on the 7th of September, at 9:30 a.m., as to why I should not have an inquiry made by a group of three surgeons." And page 8 of the transcript of that hearing reveals that it was concluded on the following note: ". . . I [the trial judge] am directing the sheriff that no questioning, no examination, no interrogation will take place out of the presence of Mr. Duard McDonald. Mr. McDonald: Yes, Sir. The Court: All right." (End of transcript of hearing).

On September 7, 1972, the attorneys for the accused filed a motion with the court asking that "all persons be en-

joined and restrained from *any* examination of the accused's body over the accused's objection, and that any and all persons be enjoined and restrained from any intrusions, of whatsoever nature, into the accused's body."

On September 8, 1972, the trial judge entered an order, in part, as follows: "Therefore, it is ordered that James Edward Creamer submit to an examination and X-ray under the control, direction and supervision of the Chief of Staff of Surgery, Cobb General Hospital, S. G. Pausa, M.D., forthwith, and that a report be made to the court as to whether the removal of the bullet can be effected without endangering his life and that a report of the procedures necessary to effect such removal be forthwith made to the court, all at the expense of Cobb County; that the district attorney make proper return of the execution of this order as provided for search warrants." It is readily seen that no provision was made in this order for the presence of counsel for the accused at such examination.

Prior to the entry of the order of September 8th, the transcript of a hearing held on September 7th reveals that Mr. Duard McDonald stated the following to the court: "Your Honor, it would be our position that you are compelling this man, over his objection, to perform an act from which evidence and, by definition, testimony, is obtained that could be incriminating, and that the compelling of his doing the act of entering into the X-ray is, in and of itself, a violation of his privilege against incrimination." (T., p. 27). This September 7th transcript also shows that Mr. McDonald directed the following to the court: "May I impose upon the court one more thing, Your Honor? Back in the hearing last Friday, the court said that until such time, I am directing the sheriff that no questioning, no examination, no interrogation will take place out of the presence of Mr. Duard McDonald. We respectfully ask the court [to] order that there be no interrogation, inspection or anything of that nature with Mr. Creamer by any law enforcement officer from anywhere outside the presence of either Mr. Rubin or somebody from my office. This has been done, Sir,

is the reason I have requested it." That same transcript at p. 32 also shows that Mr. McDonald stated to the court that he would represent the accused until he reported further to the court.

Sometime between September 8th and September 19th the physicians appointed by the court examined the accused physically and by X-ray. It appears from the transcript that the examination was conducted on September 13th because Dr. Session testified on September 19th that it was made at his office "last Wednesday." The physician testified that he interviewed the accused, and examined him orally and by X-ray. The physician also testified that the only persons present were the accused, the jailer, another gentleman from Cobb County, the physician's nurse, and the physician. The physician testified that no attorneys were present during the examination. On p. 7 of that transcript the physician also testified as follows: "He [the accused] was present in my office against his objections, but he submitted to my examination willingly and voluntarily."

It is now well settled that procedural due process under the Georgia Constitution and the Federal Constitution requires that one accused of a crime be allowed the "right to counsel" at or after the time that adversary judicial proceedings have been initiated against him.

In the recent case of Kirby v. Illinois, 406 U. S. 682, 688 (92 SC 1877, 32 LE2d 411) (1972) Mr. Justice Stewart, speaking for the Supreme Court of the United States, said: "In a line of constitutional cases in this court, stemming back to the court's landmark opinion in Powell v. Alabama, 287 U. S. 45 [supra], it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him. [Cit.]"

Mr. Justice Stewart in that case continued: "This is not to say that a defendant in a criminal case has a constitutional right to counsel only at the trial itself. The Powell case makes clear that the right attaches at the time of arraignment, and the court has recently held that it exists

also at the time of a preliminary hearing. Coleman v. Alabama, supra. But the point is that, while members of the court have differed as to existence of the right to counsel in the contexts of some of the above cases, all of those cases have involved points of time at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."

Mr. Chief Justice Burger in a concurring opinion in that case (p. 291) said: "I agree that the right to counsel attaches as soon as criminal charges are formally made against an accused and he becomes the subject of a 'criminal prosecution'."

The facts heretofore related convinced me that "adversary judicial proceedings" were initiated against the accused in the case at bar on September 1, 1972; his constitutional right to counsel attached at that time and the trial court recognized that constitutional right by appointing counsel for him; the interrogation and physical examination of the accused by a court-appointed physician took place on or about September 13, 1972, without benefit of counsel being present; such interrogation and examination by the physician was over the objection of the accused and over the objection by the attorney for the accused and all of this adds up to a denial of the right to counsel and a denial of procedural due process.

The interrogation and physical examination of the accused by the physician on or about September 13, 1972, was a vital link in determining the reasonableness or unreasonableness of the surgical search and seizure order issued by the court on September 19, 1972. Without the September 13th interrogation and examination there would have been no basis for the reasonableness of the September 19th order. The accused was entitled to have his counsel present for that September 13th interrogation and examination, and, to my mind, he was also entitled to have a physician of his own choosing present for that interrogation and examination.

Therefore, in addition to my position on the substantive

law of Georgia on this subject set forth in my original dissent, I would grant the motion to stay because this record shows that the accused has not been accorded procedural due process.

I continue to dissent.