STATE OF CONNECTICUT *v.* ANONYMOUS (1976–2)*

SUPERIOR COURT

* Thus entitled, in view of General Statutes § 54-90.

SADEN, J.  On January 2, 1975, the court granted the state's motion for a physical examination of the defendant to determine whether the defendant had been wounded by gunshot on or about June 17, 1973, in connection with the abduction and robbery. There was an encounter with the police who fired at an automobile in which the defendant and others were allegedly sitting.  When the order of January 2 was entered, the defendant was represented by other counsel.  Subsequently, present counsel entered an appearance in the defendant's behalf and now seek to reargue the motion and the order of January 2, 1975.

Previous counsel indicated that the defendant had no objection to a plain physical examination but he did object to x-rays or fluoroscopy.  Essentially the same points of law, with two exceptions, were argued by previous counsel and are now again covered by present counsel.  The court takes a dim view of a situation in which new counsel come into a case seeking to retry all of the issues previously passed on by the court after argument by competent counsel for the defendant.  To allow that procedure to occur indiscriminately will only serve to delay the disposition of criminal business.  The court will, however, make an exception in this instance because two new issues are being raised which should be

disposed of. Having thus decided to grant the motion to reargue on that point, the court might just as well hear the motion in its entirety.

The defendant objects to the state's motion for the reason that (1) a physical examination violates his privilege against self-incrimination as guaranteed by article first, § 8, of the Connecticut constitution and General Statutes § 51-35; (2) there is no court rule allowing such an order of discovery after initiation of prosecution; and (3) the court order violates the defendant's right to be secure from unreasonable searches and seizures under the fourth amendment of the federal constitution, and article first, § 7, of the Connecticut constitution, because it is not based on probable cause supported by oath.

# I

As to (1): The state's motion merely seeks to make a physical examination of the defendant. The state also requests and was granted the right to take x-rays and use fluoroscopy. No surgical intrusion of the defendant's body has yet been requested. The court is not, therefore, confronted with the extensive operative procedures involving major surgery described in *People* v. *Smith*, 80 Misc. 2d 210, 211, which caused the court there to deny the state's motion. Nor is the court concerned with a procedure such as the use of a stomach pump to extract evidence of narcotics allegedly swallowed by a suspect. *Rochin* v. *California*, 342 U.S. 165. The intrusion here does not even involve the use of a hypodermic needle for a blood test; *Schmerber* v. *California*, 384 U.S. 757; nor the excision, allowed by court order, of a bullet lodged in the fat subcutaneous area of the right side of the chest permitting its removal within fifteen minutes under local anaesthesia without risk to the defendant. *Creamer* v. *State*, 229 Ga. 511, 513.

Under the fifth amendment to the federal constitution "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." Under article I, § 8, of the Connecticut constitution, [i]n all criminal prosecutions. . . . [n]o person shall be compelled to give evidence against himself . . . ." In *State* v. *Chesney*, 166 Conn. 630, the court considered the defendant's claim that paraffin tests for gunpowder residue made of his hands, the results of which were offered in evidence against him, violated his constitutional rights. Our Supreme Court adopted (p. 639) the ruling of *Schmerber*, supra, which held that the withdrawal of a blood sample from the defendant's body, without consent, but upon probable cause, did not violate his constitutional rights. *Schmerber* points out (p. 764) that the compulsion which makes a suspect or accused the source of "real or physical evidence" does not violate a person's constitutional rights because it does not compel "communications" or "testimony." Hence the paraffin tests in *Chesney*, supra, did not violate the fourth or fifth amendments any more than does fingerprinting.

In reaching that conclusion our Supreme Court in *Chesney*, supra, apparently was not called on to consider the above-cited provision of the Connecticut constitution. It is undoubtedly true that a state may grant more protection to its inhabitants than does the United States, although it cannot grant less. See *Creamer* v. *State*, supra, 515. The defendant now asserts that the difference in language of the fifth amendment and the Connecticut constitution is significant. He claims the phrase "give evidence" carries a different connotation from that of the word "witness" used in the fifth amendment. Similar phraseology, "give evidence,"

is found in General Statutes § 51-35, but different language is used in § 52-199 which relates to "answer[ing] . . . question[s]." The defendant claims the difference between the fifth amendment and the Connecticut constitution is significant because the latter was adopted in 1818, long after the fifth amendment was in existence. He asserts that "evidence" is more than "testimonial communication" from a witness, as viewed by *Schmerber* v. *California,* 384 U.S. 757, and is more broadly inclusive. See Black, Law Dictionary. No Connecticut cases, incidentally, have had occasion to define "evidence" as such. For those reasons, the defendant resists the state's motion seeking a physical examination and/or x-rays.

The only case that has come to the court's attention construing the word "testimony" is *Creamer* v. *State,* 229 Ga. 511. There (p. 515) the Georgia constitution provided "[n]o person shall be compelled to give testimony tending . . . to incriminate himself." A Georgia statute, on the other hand, passed in 1962, used in a similar context the phrase "give evidence." In *Creamer* the court ruled (p. 516) that "testimony" as used in their constitution had a broader scope than as used in the federal constitution and included all evidence, oral or real. It then proceeded to approve the trial court's order allowing the surgical removal from the defendant's body of a bullet. The rationale is that, while a defendant cannot be required to perform some act against his will, such as putting his foot in a shoe track on the ground because that evidence might incriminate him, he nevertheless can be required to be present and to have evidence "taken from him," such as fingerprints or photographs. Whatever one might think of that rationale (cf. the better reasoning in *Holt* v. *United States,* 218 U.S. 245, 252, Mr. Justice Holmes), the court, *Creamer,* supra, 517, reached

the same conclusion as *Schmerber,* and reads the word "testimony" in its constitution to mean the same as "give evidence" in a later statute.

Wigmore has examined the fifth amendment and all the state constitutions and reached the conclusion that notwithstanding differences in language of some of the state constitutions, they all essentially mean the same thing. 8 Wigmore, Evidence (McNaughton Rev. 1961) § 2252. He points out (p. 324) that the fifth amendment language relating to self-incrimination has been adopted in similar or different language in all but two states. "Different language [from that of the Fifth Amendment] coming to the same thing, but more clearly seeming to apply only to an accused in his own prosecution, exists in [Connecticut] . . . . There is little to explain what the drafters of the [state] constitutions meant by their words. . . . The probabilities substantially favor the conclusion that the constitutional protections were originally intended only to prevent return to the hated practice of compelling a person, in a criminal proceeding directed at him, to swear against himself."

Thus the variety of constitutional and statutory phrasing neither enlarges nor narrows the scope of the privilege as developed in the common law. Wigmore, supra, p. 326; see *Counselman* v. *Hitchcock,* 142 U.S. 547, 586. Regardless of whether some state constitutions use the word "testify" and others use "furnishing evidence" or "giving evidence," the variations of wording do not signify essential differences. Wigmore, supra, § 2263.

It is also noteworthy that *Schmerber* v. *California,* 384 U.S. 757, 761 n.6, recognizes that many state constitutions phrase the privilege against self-incrimination in terms of compelling a person to give "evidence" against himself. The court then

adds: "But our decision cannot turn on the Fifth Amendment's use of the word 'witness.'" It then cites a quotation from *Counselman* v. *Hitchcock,* supra, 584–85.

For those reasons this court must rule in the present case that the state's motion does not violate any constitutional privilege against self-incrimination because it does not involve evidence that is testimonial or communicative which would make it privileged. That, of course, necessarily involves a resolution of the interpretation of language in the Connecticut constitution and statutes that accords with *State* v. *Chesney,* 166 Conn. 630; *Schmerber,* supra; and Wigmore.

## II

As to (2): The defendant argues that the court is without authority to enter an order on the state's motion for want of a rule permitting it under the Practice Book. It is true that Practice Book §§ 533A–533S were enacted with certain provisions allowing discovery in favor of the state. The defendant argues that the court is therefore strictly limited to those rules alone in effecting such discovery. There is, however, also Practice Book § 547 which provides for a liberal interpretation of the rules in any case where it shall be manifest that a strict adherence to them would work injustice. See 20 Am. Jur. 2d, Courts, § 85. Procedural rules are not ends in themselves but only the means of administering justice, and exceptions to them in specific cases may be allowed where no violation of constitutional rights is involved. From time to time the court is confronted with exceptional situations that may not be specifically covered by a specific rule. In the interests of justice, however, it has the inherent power to issue an order that meets the problem if it is satisfied no violation of substan-

tial rights will result. Thus *Jones* v. *Superior Court of Nevada County,* 22 Cal. Rptr. 879, granted the state's motion for discovery in a rape case which sought certain x-rays taken of the defendant eight years before the offense and certain medical reports bearing on the question of the defendant's claimed impotency prior to the offense. No court rule covered that situation, but the court acted "to promote the orderly ascertainment of the truth." Id., 881.

The court finds no merit in the defendant's second objection.

### III

As to (3): This relates to a fourth amendment claim against unreasonable search and seizure without probable cause supported by oath. The correlative Connecticut constitution clause, article I § 7, is also joined by the defendant as a basis for his position.

The defendant cites *State* v. *Licari,* 153 Conn. 127, 132–33, erroneously for the proposition that "a pleading of the State not made under oath . . . does not pass constitutional muster." *Licari* only requires that an arrest on a bench warrant to be valid must be supported by an affidavit setting forth probable cause for the arrest. Although the defendant further cites *State* v. *Chesney,* 166 Conn. 630, 640, as stating the necessity for probable cause to take the paraffin wax tests of defendant's hands, the case itself does not appear to make such a claim. *Chesney,* supra, does cite *Schmerber* v. *California,* 384 U.S. 757, which allowed the blood test on probable cause, but it is not clear that the element of probable cause was applied to *Chesney* itself as an important factor. *Schmerber,* supra, stands for the rule that the fourth amendment does not forbid minor intrusions into an individual's body under stringently limited

conditions and on fulfilment of probable cause requirements. *Schmerber,* supra, 770, points to the existence of facts showing probable cause as justifying the arrest which also suggested the "required relevance and likely success of" a blood test for alcohol, and then decides the question whether the arresting officer could draw those inferences himself or must obtain a warrant before making the test. It decided that delay would threaten "the destruction of evidence," and the facts here allowed no time for securing a warrant. Under those circumstances, the blood test was an appropriate incident to the defendant's arrest. In other words, the initial seizure of the defendant was a lawful arrest and the subsequent seizure of the blood sample was reasonable in light of the exigent circumstances.

In *United States* v. *Dionisio,* 410 U.S. 1, a grand jury compelled the defendant, whom it had subpoenaed, to submit voice exemplars. The court said such a subpoena is not a "seizure" in the fourth amendment sense even though it may be burdensome. Furthermore, the grand jury's subsequent directive to make a voice recording did not violate fourth amendment rights. Nor was it an intrusion into the defendant's body, as in *Schmerber,* supra. For those reasons, the defendant had no fourth amendment rights on which he could stand. Therefore there was no justification to require even the minimal requirement of "reasonableness" under fourth amendment conditions. *United States* v. *Dionisio,* supra, 15.

In the present case the defendant is under lawful arrest. The defendant concedes that the examination now sought by the state would have been proper at the time of arrest but not now, long after it. Having been legally arrested, must the state now obtain a search warrant upon affidavits or may it examine the defendant without one? No cases

exactly in point have come to the court's attention on that question. *Davis* v. *Mississippi*, 394 U.S. 721, a rape case in which some twenty-four negro youths were rounded up without probable cause for an arrest, decided that the fingerprints of the defendant, who was one of such youths and whose fingerprints were taken while he was in illegal detention, could not be used in evidence against him. The court added, however, (pp. 727, 728) that fingerprinting because of its unique nature might even under an illegal detention and under narrowly defined circumstances be found to comply with the fourth amendment notwithstanding there was no probable cause in the traditional sense, provided the order of a judicial officer is obtained in advance. Some other cases have followed that reasoning. *Biehunik* v. *Felicetta*, 441 F.2d 228, cert. denied, 403 U.S. 932, where sixty-two police officers were required to stand in a lineup for possible identification by civilians who claimed some policemen had assaulted them. Other cases, such as *United States* v. *Sanders*, 477 F.2d 112, have permitted palm prints taken while defendant was legally in custody. See *United States* v. *Anderson*, 352 F. Sup. 33, 37.

It would seem both logical and reasonable to adopt a view closer to the rationale of *Schmerber* v. *California*, 384 U.S. 757, and *United States* v. *Dionisio*, 410 U.S. 1, and some of the language in *Davis* v. *Mississippi*, 394 U.S. 721, and *Biehunik*, supra. A legal arrest ought to carry with it the right to undertake fingerprinting, handwriting exemplars, and other types of purely physical examinations without having to satisfy fourth amendment requirements. There is no question that those procedures done subsequent to a legal arrest at police headquarters or within a reasonable period of time thereafter while the defendant is still detained are proper. See *United States* v. *Edwards*, 415 U.S. 800. The

issue here is whether a physical and visual examination of the defendant's body sought some three or four weeks after arraignment, which the court assumes is also approximately the time of arrest, places it in a different category.[1] The court must keep in mind the United States Supreme Court's language in *United States* v. *Edwards,* supra, 808, where it explicitly stated that its ruling in that case did not mean that the warrant clause of the fourth amendment is never applicable to postarrest seizures of the effects of the arrestee. *Edwards* (p. 808 n.9) expanded that comment by saying the fourth amendment still applies to police conduct and applies to it the general proscription against unreasonable searches and seizures.

The court has previously referred to language in *Davis,* supra, 727–28, and *Biehunik,* supra, which indicates that fingerprinting of a suspect not yet arrested may, notwithstanding the absence of probable cause, be permissible (*Davis*) under narrowly defined circumstances and that submission to a lineup for visual examination is permissible (*Biehunik*) without probable cause. Time lag does not appear to be a vital factor in the instant case because the state's motion seeks only a physical examination which is in the same category as fingerprinting, voice and handwriting exemplars. Furthermore, the defendant is under lawful arrest, a factor not present in *Davis* or *Biehunik.* Thus it would seem the court is justified in granting a motion for a physical examination of the defendant's body limited to a visual observation. That type of examination is only slightly more burdensome than a voice or handwriting exemplar procedure. The necessity for probable cause to be

---

[1] Neither side has made any point of the fact that the defendant, while he is under arrest, is not under present detention because he has filed a bond for appearance. At least the court assumes this to be the fact from an examination of the record.

established for such a limited examination is not required if one extrapolates the import of the language of the *Davis* dictum as was done in *Biehunik* to the present facts. The issuance of a court order narrowly confined as it is meets the requirements of the suggestion in *Davis*.

That examination may or may not satisfy the state after it is completed. If it does not, the next step would be x-rays or fluoroscopy. The court believes that if the examination reaches that point, there is a question of intrusion into the body by the x-ray beam which makes it akin to the special facts of *Schmerber,* supra, 769, and which would therefore require the search warrant process to establish probable cause for the intrusion, on which the court could frame a further order if it sees fit to do so. Beyond that is the matter of surgical procedure to remove the bullet or bullets. If it is claimed that a physical examination alone, or x-rays, establish the reasonable probability of metallic objects in the defendant's body, a further search warrant should be required from proper personnel to establish the elements of probable cause and the exact nature of the procedure for surgical removal that is proposed. The court will then have to determine whether such an intrusion is justified under all of the circumstances, and that may well require an evidentiary hearing.

The present case does not disclose the kind of exigent circumstances found to exist in *Schmerber* v. *California,* 384 U.S. 757, 770, which would justify action without a search warrant. It must be recalled that the arrest in *Schmerber,* supra, was legal and yet the necessity for a warrant in compliance with the fourth amendment still had to be met or excused by exigency because of the intrusion beyond the body surface. In the instant case the defendant was arraigned on November 13, 1974, for the alleged

offense on June 17, 1973, after a long search to locate him out of state. The state filed its motion dated December 6, 1974, and the original order was entered January 2, 1975. The risk of disappearance of evidence no longer confronts the state because of the lapse of time that has already occurred. *State* v. *Chesney,* 166 Conn. 630, 640, does not speak of the necessity for a search warrant or of probable cause in connection with the paraffin wax tests on the defendant's hands. But it is patent that that test is similar to fingerprinting, voice exemplars, and handwriting exemplars. They do not intrude beyond the body surface, which is the vital ingredient that distinguishes *Schmerber,* supra. For that reason tests relating to the body surfaces (see citations in *Chesney,* supra, 640) do not require a search warrant when they occur at the time of or shortly subsequent to a legal arrest. See *United States* v. *Edwards,* 415 U.S. 800. The circumstances of this case present a situation that lends itself to the limited order promulgated by the court.[2]

For these reasons the court order dated January 2, 1975, is modified to allow a physical examination of the defendant's body, limited to a visual observation of it, to be conducted by a physician agreeable to the state in the presence of the defendant's attorney and one other representative, if the defendant chooses to have one present other than his counsel, and law enforcement officers selected by

---

[2] The affidavit attached to the application for a bench warrant is ambiguous as to how the alleged abducted victim came to receive a gunshot wound. He was allegedly in the car with the defendant and others. He may have been hit by a police bullet in the exchange of fire between them and the occupants of the getaway car, or he may have been shot by one of his abductors. If it is the former alternative, then it might serve to provide probable cause to believe that other occupants of the car besides the alleged victim may have been struck by a police bullet.

the state's attorney. The examination shall be conducted in a doctor's office or in a hospital and shall be completed within two weeks of the filing of this order.