**Kenneth O. EKELUND, Plaintiff,**

**v.**

**The SECRETARY OF COMMERCE et al., Defendants.**

No. 76 C 1069.

United States District Court, E. D. New York.

July 20, 1976.

Robert W. Nishman, Brooklyn, N. Y. (Lewis & Nishman, Brooklyn, N. Y., of counsel), for plaintiff.

Constance M. Vecellio, Brooklyn, N. Y. (David G. Trager, U. S. Atty., Brooklyn, N. Y., of counsel), for defendants.

MEMORANDUM INCORPORATING
FINDINGS OF FACT
AND ORDER

DOOLING, District Judge.

Plaintiff, a midshipman member of the 1976 graduating class at the United States Merchant Marine Academy at Kings Point, was charged with the Class I offense of the possession of dangerous drugs in that inspection of his room and personal effects resulted in the discovery of a quantity of marihuana packaged in plastic bags. USMMA Midshipmen Regulations 02105(1) defined dangerous drugs as including substances so classified by State or Federal law, and Article 02105(2) provided that a midshipman formally charged and found guilty by an Executive Board, convened by the Superintendent of the Academy of illegal possession, use or transfer of any dangerous drug, either on board the Academy or ashore, would be subject to dismissal. (See Regulations Article 03107–# 105, listing the dozen Class I offenses.) Regulations Article 03101(3)(a) defines Class I offenses as grave and deliberate violations of the standards of conduct which are completely unacceptable and may result in dismissal, suspension, or other, less severe, authorized disciplinary action, as appropriate. Class I offenses are accorded a special procedure (Regulations Article 03103) obviously designed to secure investigation and report to the Superintendent before a letter of formal charges is authorized and thereafter to require a hearing before an Executive Board convened for the case, a recommendation by the Board to the Superintendent, action by the Superintendent on the recommendation, an opportunity for a personal appeal to the Superintendent in the case of decision of dismissal or suspension, and an appeal to the Assistant Secretary of Commerce for Maritime Affairs. In plaintiff's case the Executive Board, finding no sufficient explanation or defense for the marihuana found in areas under plaintiff's control, determined that he was in violation of the Regulation and recommended that he be disenrolled in accordance with Regulation Article 02105(2). The Su-

perintendent reviewed and concurred in the recommendation of the Board, finding it both fair and in accord with the great weight of credible evidence. Plaintiff availed himself of the provision for personally requesting reconsideration by the Superintendent of the disciplinary action he had taken on the Board's recommendation (Regulations Article 03103(7)), and, on May 13, 1976, the Superintendent denied the appeal saying,

"In reaching my decision, I have weighed the evidence contained in the Executive Board report on your case and your personal statements to me asserting your innocence. Nothing in your statements have affected the great weight of credible evidence which prompted the Executive Board recommendation of disenrollment."

Plaintiff appealed to the Assistant Secretary of Commerce (Regulations Article 03103(8)). The Superintendent's decision was confirmed and adopted by the Acting Assistant Secretary in an opinion and order served on plaintiff by mail on June 3, 1976.

Plaintiff filed the present action on June 8, 1976, challenging the validity of his disenrollment on the grounds that it was based (1) on physical evidence discovered through a warrantless search made without probable cause which represented an invasion of plaintiff's constitutional rights, and (2) on the unsworn hearsay statements of a police officer who was not produced as a witness whom plaintiff could confront and cross-examine. It was alleged also that a midshipman whose testimony might well have been material had declined to testify in the proceeding on the advice of counsel. It appears to be agreed that the midshipman "steadfastly refused to testify at [plaintiff's] Executive Board and [the police officer] was not released by his command to appear before the Board."

The marihuana found in plaintiff's room was discovered during a search of the room on the night of February 20, 1976. The search grew out of the arrest in Kings Point Park earlier in the evening of Midshipmen Byrne and Franklin for possessing

marihuana. (See Memorandum in *Byrne v. Secretary,* E.D.N.Y., 76 C. 841, May 17, 1976). The story of the arrest and what followed is set forth in Patrolman Vernaskas's handwritten report. The report recites that at a few minutes after 6:00 P.M. on February 20, 1976, the patrolman approached an automobile parked unlawfully on a roadway of the Park after nightfall. Three midshipmen, Boyce, Byrne and Franklin were seated in the car drinking beer. The patrolman observed a plastic bag on the floor of the car containing what looked like marihuana. The patrolman ordered the three youths out of the car, read them their rights, and summoned assistance. A search of the vehicle (owned by Boyce's mother) was negative, but a frisk of Franklin disclosed a bag of marihuana hidden in his right sock. The three midshipmen were removed to police headquarters. Byrne and Franklin admitted that the marihuana was theirs and exonerated Boyce of complicity. Questioning by the patrolman and his superior, Lieutenant Winkelmeyer, elicited from Franklin the statement that he had bought his marihuana while on home leave, and from Byrne the statement that the bag of marihuana dropped on the floor of the car was his, and that he had bought it at the Academy from a 1st Class cadet, Ekelund. Lieutenant Winkelmeyer's typed report of the interview adds that Byrne said under further questioning that "he bought his bag of marijuana today for $20. from another cadet, 1st. classman, Kenneth Ekelund."

Patrolman Vernaskas then proceeded to the Academy. He was put in telephone contact with Lieutenant Timothy Ford's house on the Academy grounds and stated to Lieutenant Ford that he had reliable information or information from a confidential informant that Ekelund was selling marihuana at the Academy and had a cache of it in his room. The patrolman did not say that Byrne was his informant and he was not asked for the informant's name or the basis for the assertion that he was a reliable informant. Patrolman Vernaskas had no search warrant and he was not asked whether he had one, whether he had

not had ample time to obtain one, nor why he had not obtained one. Lieutenant Ford explained that the Academy had the right to inspect the midshipmen's rooms, and, acting after telephone contacts with, and authorization from, the Commandant of Midshipmen, and after ascertaining, and advising the Commandant, that Patrolman Vernaskas meant to arrest Ekelund if marihuana was found in his room (a point Vernaskas cleared by telephone with his superior), Lieutenant Ford went with the patrolman to Ekelund's room. Ekelund was not in his room and the door was locked.

It was apparent that there were midshipmen in the room directly across the corridor. Lieutenant Ford found it locked, however, and it was opened only after a substantial delay; there were six midshipmen in the room—Ekelund was not one of them—and there was a strong smell of what seemed to be marihuana and beer. A search of the room unearthed no marihuana but some beer. However, when Lieutenant Kenneth Lyons, at Lieutenant Ford's request, searched the ground below the window of the room, he found a clear plastic bag of what appeared to be marihuana that could have been, but was not known to have been, thrown out of the window where the six midshipmen were. Patrolman Vernaskas was aware of what was occurring in the room across from Ekelund's and was shown the bag of marihuana, but he made no arrest, and Lieutenant Ford did not proffer him the opportunity to make a police investigation of the incident, to take possession of the bag of marihuana, or to arrest any of the six midshipmen. The six were, however, charged with Class 1 and lesser violations and, after an Executive Board hearing, the charges against them were, in effect, dismissed.

Meanwhile, Lieutenant Ford unlocked Ekelund's door and started Patrolman Vernaskas on a search of the room, indicating where he was to start the search. Much of Lieutenant Ford's attention and time was taken up with the incident across the corridor, and he and Lieutenant Lyons were not in Ekelund's room during every moment of

the search, but Lieutenant Ford was responsible for the identification to Patrolman Vernaskas of the places to be searched and was in earshot of Patrolman Vernaskas when not in Ekelund's room with him. During some or all of the period of search one of the midshipmen was present as an observer and may have lent some mechanical assistance. Some if not all of the marihuana located in Ekelund's possessions in the room was discovered while Lieutenant Ford was in Ekelund's room with Patrolman Vernaskas and was guiding and, to an extent, participating in the search. After the discovery of some or all of the marihuana, Ekelund was sent for. He appeared, was given his rights and arrested. No reason for not summoning him before commencing the search appears. He was on the Academy grounds at all the times in question.

At the Executive Board hearing the use in evidence of the marihuana and testimony about its discovery were objected to on constitutional grounds as was the failure to produce Patrolman Vernaskas and Midshipman Byrne as witnesses so that they could be confronted and cross-examined. There was also timely objection to the use in evidence of Patrolman Vernaskas's and Lieutenant Winkelmeyer's written reports of the Byrne—Franklin interviews and Patrolman Vernaskas's report of the search episode. Lieutenants Ford and Lyons appeared as witnesses and were cross-examined, and Ekelund, and Ekelund's roommate Truett testified. Byrne, acting on advice of counsel, declined to testify. Patrolman Vernaskas was not made available by the Kings Point Police Department, apparently in accordance with departmental policy, and the Executive Board had no power to compel him to appear. Ekelund appeared by counsel from outside the Academy, and an officer of the Academy had been assigned to represent him.

█ The use in evidence of the product of the search of Ekelund's room was not an invasion of his constitutional rights. The search was in substance a search by the state authorities and they had ample evidence to support the search. In retrospect there might have been time to apply for a warrant before going to the Academy. But the police decision to go at once to the Academy and seek its cooperation was prudent, and, as Patrolman Vernaskas suggested in his testimony, was the practical course in the face of the fact that the place to be searched was a room in a federal educational institution. A magistrate, foreseeably, would hesitate or delay or might even refuse to issue a warrant. The stock of marihuana that a midshipman could have in his room could be expected to be modest and fast-moving. And the fact of the arrest of Byrne and Franklin could be expected to reach the Academy quickly and alarm the midshipman Byrne named as his supplier. The search was based on probable cause and the exigent circumstances and federal status of the place to be searched excused the police from seeking a warrant. The search, therefore, was not an unreasonable search and the seizure of the marihuana did not invade plaintiff Ekelund's constitutional rights. *Cf. Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 454–455, 474–475, 486–490, 91 S.Ct. 2022, 29 L.Ed.2d 564; *United States v. Santana*, 1976, —— U.S. ——, 96 S.Ct. 2406, 2408, 49 L.Ed.2d 300, (1976, and concurring opinion of Mr. Justice Stevens, Mr. Justice Stewart concurring.)

The search was a search by a state law enforcement officer who took the marihuana into his possession for use in a criminal prosecution, which, indeed, was promptly initiated. The role of the Academy and its officials was not to search and seize, or even to authorize the state law enforcement officer's search and seizure. The Kings Point police were authorized to search by the probable cause they had. What the Academy did was to permit the search, to interpose no obstacle to it, and to assist in it. The place to be searched was in a federal institution. Plaintiff Ekelund was one of two occupants of the room, and Patrolman Vernaskas's information accused only Ekelund and not his room-mate. The room was subject to very frequent inspection "by authorized personnel" (daily, weekly and formal inspections are prescribed in

Article 08203), and, in addition Article 08201(2) provides (under the catch-line "Condition of Rooms") that

"Midshipman rooms may be inspected at any time by authorized personnel for purposes of observation of room conditions and to check for violations of USMMA Midshipmen Regulations."

Possession of marihuana is a Class I offense (as noted above) and possession of alcoholic beverages is a Class II offense (Articles 02102, 03107–204). Moreover, the Commandant's Instruction 02105.2A of August 1, 1974, on the subject of Drug Abuse advised the midshipmen:

"6. THE ACADEMY AND PUBLIC LAW: Midshipmen who violate Federal or State Laws relative to drug abuse are subject to the penalties prescribed by law. The Academy is subject to concurrent Federal, State and local jurisdiction and it shall in no way provide protection from the law."

To the extent, then, that what has been denominated "the expectation of privacy" is a significant factor in resolving search and seizure questions, the midshipmen of the Academy could have little if any such expectation. Article 08201 can be interpreted as authorizing some such expectation only as to the midshipman's "PERSONAL DRAWER" (Article 08201(5)), and even that drawer

". . . may be opened in the presence of the Midshipman for inspection relative to any violations of Midshipman Regulations, but shall not be opened in his absence."

The Regulations make it clear that so far as the Academy can be considered a participant in the police search, it acted with ample authorization in the regulations and in a situation in which a midshipman could entertain no expectation of privacy. *Cf. Committee for Constitutional Rights v. Callaway*, 1975, 171 U.S.App.D.C. 73, 518 F.2d 466, 477; *Biehunik v. Felicetta*, 2d Cir. 1971, 441 F.2d 228, 230–231 (and cases cited therein).

■ Finally, the use of the evidence discovered in the search in the disciplinary proceeding must be considered in light of the fact that it is a civil proceeding. The consequences of the proceeding are grave, but it is not a criminal proceeding, and in no true sense is the proceeding punitive or vindictive, nor is it a forfeiture proceeding. Rather it is a determination of unfitness for training for command rank in the merchant marine. In such a case the use in evidence of that which might be excluded in a criminal case does not involve an invasion of a constitutionally protected interest. The searching re-examination of the question in *United States v. Janis*, 1976, —— U.S. ——, 96 S.Ct. 3021, 49 L.Ed.2d ——, emphasizes how dubious is the principle of exclusion even as applied in criminal cases and the further damage to the search for truth that must flow from uselessly extending it to civil cases. (Note the second sentence of footnote 31).

■ There was no departure from the due process standards appropriate to the proceeding in the conduct of the Executive Board hearing. The tribunal could not compel the appearance of Byrne or Vernaskas as witnesses and use of the police reports, obviously hearsay to the tribunal, was not impermissible. That they were hearsay was evident to the hearing officers. But so far as plaintiff Ekelund was concerned, the critical issue was whether or not he was consciously in possession of marihuana in his quarters. On that issue Lieutenant Ford was an eyewitness called to be cross-examined and contradicted by plaintiff, and plaintiff was able to and did call his room-mate as a witness. Lieutenant Lyons was present at part of the search and was also called as a witness and cross-examined. It is evident that the hearing officers were confronted with an issue of credibility, and that they did not believe plaintiff Ekelund.

It follows from what has been said that plaintiff is not entitled to the preliminary relief he seeks. It is,

ORDERED that plaintiff's motion for a preliminary injunction restraining defendants from dismissing, suspending or exclud-

ing him from the United States Merchant Marine Academy is denied.