_____

No. 95-2276
_____

Cleoria Thompson, as next          *
friend of Ramone Lea, a minor,     *
                                   *
                                   *
      Plaintiff - Appellee,        *
                                   *
      v.                           *
                                   *
Carthage School District;          *
Randy King, individually and in    *  Appeal from the United States
his capacity as Superintendent     *  District Court for the
of Schools; Randy Harris, Bruce    *  Eastern District of Arkansas.
McCracken, Curtis Rushing, Gail    *
Toney, individually and in         *
their official capacity as         *
Members of the Board of            *
Education; Norma Bartel, Ralph     *
Malone, individually and in        *
their capacity as employees of     *
the Carthage School District,      *
                                   *
      Defendants - Appellants.     *
                               _____

                    Submitted:  January 11, 1996

                       Filed:  June 28, 1996
                               _____

Before LOKEN, REAVLEY,* and HANSEN, Circuit Judges.
                               _____


LOKEN, Circuit Judge.


      Ramone Lea was expelled from Carthage High School after school
officials found crack cocaine in his coat pocket while looking for guns and
knives reported to be on school grounds.  The district court awarded
$10,000 in § 1983 damages for "wrongful expulsion" because the search had
violated Lea's Fourth Amendment

_____

      *The HONORABLE THOMAS M. REAVLEY, United States Circuit Judge
      for the Fifth Circuit, sitting by designation.

rights.  The Carthage School District, four members of its Board of Education, the school Superintendent, and the educators who performed the search appeal.  Concluding that the Fourth Amendment exclusionary rule does not apply to school disciplinary hearings, and that the search was constitutionally reasonable, we reverse.

## I.

Carthage is a small, rural school district in which all grades are housed at one location.  Total enrollment is about 225; 90 to 100 students attend the High School.  On the morning of October 26, 1993, a school bus driver told Norma Bartel, the High School principal, that there were fresh cuts on seats of her bus.  Concerned that a knife or other cutting weapon was on the school grounds, Bartel concluded that all male students in grades six to twelve should be searched.  After the search began, students told Bartel that there was a gun at the school that morning.

Bartel and science teacher Ralph Malone conducted the search by bringing each class of students to Malone's classroom.  The students were told to remove their jackets, shoes, and socks, empty their pockets, and place these items on large tables in the science room.  Bartel and Malone then checked the students for concealed weapons with a metal detector. Malone would pat down a student if the metal detector sounded, as it often did because of the metal brads on the students' blue jeans.  Malone and Bartel also patted the students' coats and removed any objects they could feel in the coat pockets.  They completed the search before Superintendent Randy King arrived at 9:30 that morning.

Lea was a ninth grade student at the time of the search.  Neither Bartel nor Malone had reason to suspect that Lea had cut the school bus seats or had brought a weapon to school that morning.  Lea's class was one of the last to be searched in the science room.  Malone searched Lea's coat pocket and found a used

book of matches, a match box, and a cigarette package.  Considering these items to be contraband, Malone showed them to Bartel, and she brought them to her office.  Bartel found only cereal in the cigarette package but discovered "a white substance" in the match box.  She took the match box to King, who turned it over to a deputy sheriff.  A test revealed that the white substance was crack cocaine.  After a hearing, Lea was expelled for the remainder of the school year.

Lea and his guardian, Cleoria Thompson, commenced this § 1983 action, alleging that the search and expulsion violated Lea's Fourth Amendment rights, and that the expulsion hearing denied him due process.  The parties submitted the case on depositions and affidavits.  The district court held that the expulsion proceeding comported with due process, but that Lea's expulsion was wrongful because the search had violated his Fourth Amendment rights.  The school officials had no "individualized, particularized suspicion" that Lea was carrying a weapon or other contraband, and "there was no adequate basis in the evidence to justify the initial decision to search all 6-12 grade boys."  In addition, the court reasoned, Bartel and Malone seized the match box after they knew that Lea did not possess a knife or gun.  The court awarded Lea $10,000 in compensatory damages against defendants Bartel, Malone, King, and the school board members who voted for expulsion.  It awarded Lea a reasonable attorney's fee, granted a declaratory judgment that his Fourth Amendment rights were violated, but declined to issue an injunction.  This appeal followed.

## II.

At the outset, we confront an issue ignored by the parties and the district court -- whether the Fourth Amendment's exclusionary rule applies in school disciplinary proceedings.  At oral argument, we invited counsel to submit supplemental briefs addressing this issue, but neither side did so.  The issue is critical because the

-3-

district court awarded substantial damages for wrongful expulsion, based entirely on the proposition that Lea could not be expelled for possessing crack cocaine discovered during an illegal search.

The judicially-created exclusionary rule precludes admission of unlawfully seized evidence in criminal trials. "In the complex and turbulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state." United States v. Janis, 428 U.S. 433, 447 (1976). In Janis, the Court held that the rule does not apply in federal tax proceedings to bar evidence illegally seized by state officials. In INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), the Court held that the rule does not apply in civil INS deportation hearings. The Court's "framework" for deciding whether the exclusionary rule applies in a particular civil proceeding is to analyze whether the likely benefit of excluding illegally obtained evidence outweighs the societal costs of exclusion. Id. at 1041.

The societal costs of applying the rule in school disciplinary proceedings are very high. For example, the exclusionary rule might bar a high school from expelling a student who confessed to killing a classmate on campus if his confession was not preceded by Miranda warnings. We doubt that any parent would compromise school safety in this fashion. To the extent the exclusionary rule prevents the disciplining of students who disrupt education or endanger other students, it frustrates the critical governmental function of educating and protecting children.

Moreover, "maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures." New Jersey v. T.L.O., 469 U.S. 325, 340 (1985). Application of the exclusionary rule would require suppression hearing-like inquiries inconsistent with the demands of school discipline, demands that led the Court to impose very limited due

process requirements in Goss v. Lopez, 419 U.S. 565, 583-84 (1975).

The benefit of the exclusionary rule depends upon whether it would effectively deter Fourth Amendment violations.  In that regard, this case is like Lopez-Mendoza in one important respect -- school officials both conducted the search and imposed the student discipline.  Knowing that evidence they illegally seize will be excluded at any subsequent disciplinary proceeding would likely have a strong deterrent effect.  See 468 U.S. at 1042-43.

But there are also important differences between school discipline and the deportation proceeding at issue in Lopez-Mendoza.  The dissenters in that case argued for the exclusionary rule "[b]ecause INS agents are law enforcement officials whose mission is closely analogous to that of police officers and because civil deportation proceedings are to INS agents what criminal trials are to police officers."  468 U.S. at 1053 (White, J., dissenting).  School officials, on the other hand, are not law enforcement officers.  They do not have an adversarial relationship with students.  "Instead, there is a commonality of interests between teachers and their pupils.  The attitude of the typical teacher is one of personal responsibility for the student's welfare as well as for his education."  T.L.O., 469 U.S. at 350 (Powell, J., concurring).  Moreover, children's legitimate expectations of privacy are somewhat limited at school.  Therefore, while the Fourth Amendment applies to searches by school officials, its reasonableness standard, when applied to school searches, "stops short of probable cause."  T.L.O., 469 U.S. at 341.

In these circumstances, we conclude that there is little need for the exclusionary rule's likely deterrent effect.  Indeed, we see some risk that application of the rule would deter educators from undertaking disciplinary proceedings that are needed to keep the schools safe and to control student misbehavior.  In any event, any deterrence benefit would not begin to outweigh the high

societal costs of imposing the rule. Therefore, like most district courts that have published opinions applying Janis and Lopez-Mendoza,[1] we conclude that the exclusionary rule may not be applied to prevent school officials from disciplining students based upon the fruits of a search conducted on school grounds. Accordingly, Lea was not wrongfully expelled, and the $10,000 damage award must be reversed.[2]

## III.

In concluding that the search violated Lea's Fourth Amendment rights, the district court emphasized the fact that Bartel and Malone had no individualized reason to suspect Lea of carrying a weapon. In T.L.O., 469 U.S. at 342 n.8, the Supreme Court had left open the issue whether individualized suspicion is always required for school searches. However, after the district court decided this case, the Supreme Court upheld random drug testing of high school athletes despite the absence of individualized suspicion in Vernonia Sch. Dist. 47J v. Acton, 115 S. Ct. 2386 (1995). The Court clarified that individualized suspicion is not always required for school searches. It recognized that the drug testing at issue was inherently intrusive. (Taking a urine sample and requiring disclosure of health information is more intrusive than, for example, looking in a purse, the search at issue in T.L.O.) But the Court concluded that this significant privacy invasion was justified by the important government interest in reducing drug abuse by student athletes. 115 S. Ct. at 2396.

---

[1]See James v. Unified Sch. Dist. No. 512, 899 F. Supp. 530, 533-34 (D. Kan. 1995); Morale v. Grigel, 422 F. Supp. 988, 999-1001 (D.N.H. 1976); Ekelund v. Secretary of Commerce, 418 F. Supp. 102, 106 (E.D.N.Y. 1976). Contra, Jones v. Latexo Indep. Sch. Dist., 499 F. Supp. 223, 238-39 (E.D. Tex. 1980).

[2]Like the Supreme Court in T.L.O., we do not consider whether evidence illegally seized by school officials on school grounds is admissible at a subsequent criminal trial or delinquency proceeding. See 469 U.S. at 333 n.3.

Vernonia impacts this case in one significant way -- it confirms that the doctrine of qualified immunity bars any award of damages. The individual defendants did not violate clearly established law when they decided to search all the older male students for dangerous weapons reported to be on the school grounds. See Anderson v. Creighton, 483 U.S. 635, 639-40 (1987).

The district court rejected Lea's due process claim and denied him injunctive relief. With a damage award now foreclosed by Vernonia and our decision that there was no wrongful expulsion, the award of an attorney's fee must also be reversed. See Farrar v. Hobby, 113 S. Ct. 566, 575 (1992). That ends the case, except for a difficult issue that has little remaining practical significance -- whether the district court erred in declaring that the search violated Lea's Fourth Amendment rights.

The Fourth Amendment inquiry in school search cases is whether the search was reasonable in all the circumstances. The inquiry focuses on whether the search was justified at its inception, whether its scope was reasonably related to the circumstances justifying a search, and the extent of the privacy intrusion. See T.L.O., 469 U.S. at 341. In a school setting, "the relevant question is whether the search is one that a reasonable guardian and tutor might undertake." Vernonia, 115 S. Ct. at 2397. We review the reasonableness issue *de novo*. See United States v. Brown, 51 F.3d 131, 132 (8th Cir. 1995).

The district court concluded that the broad search for knives and guns was not justified at its inception because the Carthage School District was not facing a "serious, on-going, problem with such dangerous instrumentalities." In our view, that analysis is inconsistent with Vernonia. Principal Bartel had two independent reasons to suspect that one or more weapons had been brought to school that morning. Though she had no basis for suspecting any particular student, this was a risk to student safety and school

-7-

discipline that no "reasonable guardian and tutor" could ignore. Bartel's response was to issue a sweeping, but minimally intrusive command, "Children, take off your shoes and socks and empty your pockets." We conclude that Bartel's decision to undertake this generalized but minimally intrusive search for dangerous weapons was constitutionally reasonable. See Cornfield v. Consolidated High Sch. Dist. No. 230, 991 F.2d 1316, 1320-21 (7th Cir. 1993).

The district court further concluded that the scope of the search was not reasonably related to its original purpose because Lea's pockets were searched after the metal detector had revealed that he did not possess a gun or knife. But in a school setting, Fourth Amendment reasonableness does not turn on "hairsplitting argumentation." T.L.O., 469 U.S. at 346 n.12. If Lea had emptied his own coat pocket, the cigarette package and match box would have become contraband in plain view. It is not constitutionally significant that teacher Malone emptied the pocket after Lea put his jacket on the table. Moreover, once Bartel and Malone reasonably decided to quickly search many children's pockets for dangerous weapons, it is not realistic to require them to abort the search of a particular child who does not appear to be in possession of such contraband.

To summarize, while we share the district court's concern over excessive use of sweeping searches of school children's persons and belongings, even in a minimally intrusive manner, we conclude that the search undertaken in this case passes muster under T.L.O. and Vernonia. The judgment of the district court is reversed and the case is remanded for entry of judgment in favor of defendants.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-