72684. GRAVLEY v. THE STATE.
72952. BOTTS v. THE STATE.
(352 SE2d 589)

BIRDSONG, Presiding Judge.

Appellants were convicted in separate trials of violating the Georgia Controlled Substances Act by manufacturing and possessing marijuana. We have consolidated their appeals in this opinion. They each urge error in the denial of their motion to suppress based upon an asserted illegal search and seizure. *Held:*

At the hearing on the motion, evidence disclosed that two deputy sheriffs for Cherokee County received a radio message from the chief deputy sheriff directing them to go to appellant Gravley's residence

and check out a tip that Gravley was growing marijuana in a garden at his residence. It does not appear that the officers knew the physical location of the garden on Gravley's property, thus they went initially seeking Gravley to talk to him about the tip. When the deputies arrived at Gravley's residence, appellant Botts was in the front yard working on a car. Botts told one of the officers that Gravley was asleep but she would go inside to get him. They observed Gravley looking at them through a window. Then Botts returned and said Gravley would be out in a few minutes. Gravley did not come out even after ten or fifteen minutes whereupon the officers asked some children playing in the yard if they would go in and ask Gravley to step outside. A young girl went in the house but did not return. She was seen coming out the back door and again was asked if Gravley was in the house. The girl indicated she thought Gravley had gone to the barn to feed the horses. The officer then walked toward the barn to find and talk to Gravley. As he approached the barn, he did not see Gravley but could see through the open passageway through the barn to what ultimately proved to be a vegetable garden, where he saw someone moving rapidly from place to place behind the barn. The officer walked through the barn to the garden and saw Gravley pulling up marijuana plants and throwing the plants over the fence. Gravley was then arrested. It was later determined that Botts and Gravley lived together and she was arrested and charged with the same offense as a joint possessor.

The physical layout of this residence was composed of the residence (a double-wide trailer), approached by a driveway running off a dirt road leading from a paved road; a car shed behind the trailer, a barn behind the car shed and a garden behind the barn. Appellants urge, and for purposes of this opinion we agree, that these surroundings were lying within what classically has been a part of the "curtilage" and under other circumstances might have been protected from a warrantless search and seizure.

An analysis of Fourth Amendment protection against unlawful searches and seizures must begin with the Amendment: "[t]he right of the people to be secure in their persons, houses, papers and effects. . . ." Obviously, the Amendment does not include by definition "the curtilage." However, as recognized in numerous decisions of the courts of this state, the curtilage has been brought within the ambit of the Amendment protecting against unreasonable or warrantless searches. At common law the curtilage included all that space of ground and buildings thereon which usually is enclosed within the general fence surrounding a principal dwelling house and outbuildings, and yard closely adjoining to the dwelling house. Black's Law Dictionary, Rev. Fourth ed., p. 46. Our courts have included a garden by definition as being within the curtilage. *Landers v. State*, 250 Ga.

808, 809 (301 SE2d 633).

First, it is observed that including generically a garden within the curtilage appears to be a recognition of an earlier held view that the Fourth Amendment protection against unreasonable searches and seizures was rooted in a protection of the property constituting a man's defendable domicile, his own personal castle. Thus, outbuildings including tool sheds, barns, garages and the like which were built adjacent to a house were considered to be such an integral part of a man's home that it figuratively was considered as lying within the "fenced" or "walled" area that traditionally a man called home and from which all could be excluded and denied access by the fence or wall. Likewise and legitimately a garden within that same personal area (i.e., the curtilage) was afforded the same protection. Several decades ago, this protection relating to the right to be secure in the "house" was packaged in the "exclusionary rule" adopted by the Supreme Court of the United States and made the law of the land.

During the recent past, much dissatisfaction has been expressed judicially as well as by the laity to the strictness of this exclusionary rule. The very same court that originally laid down the definition and set forth its application as a property concept began a process of relaxation. The Supreme Court in *Hester v. United States*, 265 U. S. 57 (44 SC 445, 68 LE 898) held that the special protection accorded by the Fourth Amendment to citizens in their persons, houses, papers, and effects does not extend to an open field. Thus an "open" field was held not to be an "effect." Stated otherwise, an "open field" traditionally did not lay within the fenced or walled area and thus was not a part of the "house." Later the Supreme Court determined in *Katz v. United States*, 389 U. S. 347 (88 SC 507, 19 LE2d 576) that the touchstone of the Fourth Amendment is whether a person has a constitutionally protected reasonable expectation of privacy and not exclusively limited to a property concept inherent in a house or its intimately related defensible grounds within the wall or fence. In the case of *Oliver v. United States*, 466 U. S. 170 (104 SC 1735, 80 LE2d 214), the court reasoned that an individual may not legitimately demand *privacy* for activities conducted *out of doors* in fields, except in the area immediately surrounding the home. Thus, the court, while recognizing and protecting the concept of curtilage (apparently in geophysical terms; i.e., was the protected object within or without the protected area), the court at the same time further weakened the constituents of the curtilage. It was concluded that there is no societal interest in protecting the privacy of those activities, such as the cultivation of crops (and ostensibly including vegetables and flowers) that occur in open fields, i.e., activities that may be seen by the casual observer. The Supreme Court observed in *Oliver*, supra at p. 180, fn. 11: "An open field need be neither 'open' nor a 'field' as those terms

are used in common speech. For example . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." Thus, as a practical matter, such areas are open to view and accessible to the public (even to a trespasser) and the police in ways that a home, an office, or a commercial structure would not be. *Oliver*, supra at p. 179.

Thus it is concluded the protection as originally afforded to the curtilage was a concept grounded in the protection of property. As previously indicated, at common law, the curtilage was that fenced area which projects to an area outside but immediately adjacent to the home, the *intimate* activity associated with the sanctity of a man's home and the privacies of life. See *Boyd v. United States*, 116 U. S. 616, 630 (6 SC 524, 29 LE 746). As an extended part of the home itself, it was thus afforded Fourth Amendment protection.

However, as hereinbefore stated, we believe that within the Fourth Amendment, the concept of protection of *property* has evolved (through repeated interpretation) and now looks to the reference of factors that indicate whether an individual reasonably may expect an area immediately adjacent to the home will remain private, i.e., a reasonable expectation of privacy. See, e.g., *United States v. Knotts*, 460 U. S. 276, 280-281 (103 SC 1081, 75 LE2d 55); *United States v. Van Dyke*, 643 F2d 992, 993-994. As a result, we conclude no rational person can have a reasonable expectation of privacy in an open area such as a yard or a garden even in the curtilage where the contents of the yard or garden casually are open to public view. See *United States v. Pruitt*, 464 F2d 494. *Smith v. Maryland*, 442 U. S. 735, 740 (99 SC 2577, 61 LE2d 220) held: "Consistently with *Katz*, this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded. . . . This inquiry . . . normally embraces two discreet questions. [1] . . . whether the individual . . . has exhibited an 'actual (subjective) expectation of privacy.' 289 U. S. at 361 . . . the individual has shown that 'he seeks to preserve (something) as private.' Id. at 351. The second question is whether the individual's subjective expectation of privacy is 'one that society is prepared to recognize as reasonable'. . . . Id. at 361."

As an example, it is suggested that one who plants marijuana among his petunias in the front yard (and clearly in the curtilage) has no reasonable expectation of privacy when in fact the garden is in plain view to passersby on the street and sidewalk. Likewise, one who deposits contraband (or grows marijuana) in his backyard even adjacent to his home in such a position that a passerby who can see through or over a fence and thus readily can view the contraband likewise has no reasonable expectation of privacy. See *State v. Lyons*,

167 Ga. App. 747 (307 SE2d 285). Today the protection afforded to the "curtilage" is no more or no less than that reasonable expectation of privacy to which the home resident reasonably expects to be afforded his secluded activities within the home. *Oliver*, supra at p. 182, fn. 12. However reasonable a landowner's expectation of privacy may be, those expectations cannot convert grounds (open to casual view) into a "house" or an "effect." *Oliver*, supra at p. 184. While it may be true that appellants subjectively may have intended the marijuana growing in the garden behind the barn to remain private, the circumstances of the planting in the open and subject to view render that expectation of privacy non-justifiable. *Smith*, supra at p. 740.

In substance then, we conclude that where one exposes to open view that which is contraband, he forfeits his right to any reasonable expectation of privacy. "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, supra at p. 351. In such a case, the question of "lying within the curtilage" should be limited to the protection afforded the home dweller and the property making up the home (i.e., barns, outbuildings, and enclosed structures, the contents of which normally are not exposed and thus reasonably can be expected to remain private) and not extended to grounds exposed to view by a deliberate course of action whereby the dweller offers the contraband to the view of those who have the opportunity to view. The mere fact, for instance, that the homeowner makes every conscious effort to seclude and protect the property by placing "No Trespass" signs, enclosing with a fence, or secluding in a wooded area, will not shelter criminal activity nor protect that activity under the Fourth Amendment. *Oliver*, supra at p. 182, fn. 13. This manifestly is true for notwithstanding such effort to protect the area, so long as it is not hidden from sight by an enclosure, the public and police may survey lands from the air. For such reasons, the asserted expectation of privacy of contraband exposed in an area open to view is not an expectation that our society recognizes as reasonable. *Oliver*, supra at p. 170.

While it is true that some areas (i.e., fields) are protected by the laws of trespass, those laws protect rights which are not necessarily included within the rights protected by the Fourth Amendment, for trespass laws extend to instances where the exercise of the right to exclude vindicates no legitimate privacy interest. *Oliver*, supra at p. 183, fn. 15.

Earlier cases such as *Landers v. State*, 250 Ga. 808, 809, supra; *State v. Nichols*, 160 Ga. App. 386 (287 SE2d 53) and *Norman v. State*, 134 Ga. App. 767, 768 (1) (216 SE2d 644) are cases decided prior to *Oliver v. United States*, supra, or are clearly distinguishable (indeed *Landers v. State* other than giving a general definition of "curtilage" is consistent with the position herein adopted, i.e., that

property *hidden* from open view, even though not in the curtilage, is subject to a Fourth Amendment protection). We seek to point out that the state of the law has changed from a bare statement that protection is afforded because a "garden is a part of the curtilage" to a question of whether one who exposes contraband to open view even in the curtilage still may claim a reasonable expectation of privacy. In the three cases, the necessity of determining the scope of the curtilage (including a garden) was made because of the proximity of the stash of contraband to the home itself. In *Norman,* supra, the contraband was out of sight in a truck (i.e., protected from view) but the truck was within 250 feet of the house and 100 feet of the barn. That made the parking site "within the curtilage." In the *Landers* case, supra, the contraband was out of sight in appellants' van, but though parked close to a residence was not within the curtilage but afforded protection notwithstanding. In the *Nichols* case, supra, though apparently this court concluded that while perhaps a roto-tiller lying on the appellant's yard adjacent to his trailer might be in the curtilage (a point conceded in the trial court by the State) that rule had no application for the roto-tiller, even if close to the trailer, was "in plain view" and thus even if a "seizure" occurred, there was no search.

In this case, the open ground (or "garden" as appellants chose to label it) lay behind the barn. Pretermitting its location within the curtilage, for all the facts show the police could have approached the "garden" without ever passing the house, the garage or the barn (i.e., the curtilage) simply by coming from the opposite direction. Nevertheless, regardless of its location, it is clear that appellants deliberately chose to grow the marijuana in a non-enclosed area (i.e., outside any kind of structure) and thus open to plain view to those having an opportunity to approach or pass by the field (or garden). The facts reasonably support the trial court's conclusion that the deputies were present on the premises looking for Gravley and not conducting a search for marijuana. Upon seeing suspicious activity in plain sight, the officers had not only the right but the duty to investigate the unusual activity in progress within their view. See *Adams v. Williams,* 407 U. S. 143, 145 (92 SC 1921, 32 LE2d 612); *Stiggers v. State,* 151 Ga. App. 546, 547 (1) (260 SE2d 413). Under such circumstances, appellants waived any reasonable expectation of privacy and forsook any protection otherwise afforded by the Fourth Amendment. For the same reason, appellants cannot invoke any such protection simply by claiming the "garden" was a part of the curtilage as that expression is interpreted by the current state of the law of protection against unreasonable searches and seizures. As earlier observed herein, in a concurring opinion in *Oliver v. United States,* Justice White observed: "However reasonable a landowner's expectations of privacy may be, those expectations cannot convert a field into a 'house' or an 'effect.' "

Accordingly, the judgment of the trial court is affirmed.

*Judgments affirmed. McMurray, P. J., and Pope, J., concur. Deen, P. J., Carley and Beasley, JJ., concur specially. Banke, C. J., Sognier and Benham, JJ., dissent.*

BEASLEY, Judge, concurring specially.

I concur separately because I do not take the same route charted by my other brethren who, as I do, find no Fourth Amendment violation.[1]

First, as to the "curtilage" and "expectation" questions, which I do not consider to be controlling, I, too, am not led by law or logic to conclude that the place from which the marijuana was seized was outside the curtilage of the house. I am not persuaded that the residents could not claim a justifiable expectation of privacy in the garden, or that their subjective expectation of privacy in that part of their premises is one which society is not prepared to recognize as reasonable.

To say that the garden was outside the curtilage and thus not protected in the first place because classified as subject to the "open field" doctrine would mean that the officers could have simply come upon the property and searched for the garden which their tip indicated had marijuana growing in it. Considering the nature of this property, the composition of the improvements upon it, and the defendants' relationship to it, I do not believe the "open field" doctrine applies. " 'Whether the place searched is within the curtilage is to be determined from the facts, . . .' " *Payton v. State,* 177 Ga. App. 104, 105 (1) (338 SE2d 462) (1985); *Meeks v. State,* 178 Ga. App. 9, 10 (2) (341 SE2d 880) (1986).

Defendants' residence, a double-wide trailer, was approached by a driveway off a dirt road running from a state road. A small car shed was behind it, a barn was directly behind it, and a garden was behind the barn. The garden, which had corn, tomatoes, okra, beans, and other vegetables growing in it as well as the marijuana plants, was about 100 feet from front to back and could not be seen from the roadway or the front yard. Tall pine trees obscured the garden from aerial view, and the next residence was several hundred yards away.

The garden described in the testimony and displayed in photos and diagram does not fit into the "open fields" category envisioned in *Hester v. United States,* 265 U. S. 57 (44 SC 445, 68 LE 898) (1924) and *Oliver v. United States,* 466 U. S. 170 (104 SC 1735, 80 LE2d 214) (1983). The rule of *Hester,* which was reaffirmed in *Oliver,* "may

---

[1] Although appellants also invoke Art. I, Sec. II, Par. XIII of the Constitution of Georgia of 1983, they make no argument in support of this bald assertion and so I would consider it abandoned. *Taylor v. State,* 177 Ga. App. 624, 628 (3) (340 SE2d 263) (1986).

be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home . . . The Amendment reflects the recognition of the Founders that certain enclaves should be free from arbitrary government interference." *Oliver*, supra at 178.

Here we have a small plot, not accessible to the public either physically or by view, close to the house, with a path to it from the barn in front of it.

"[T]he common law distinguished 'open fields' from the 'curtilage,' the land immediately surrounding and associated with the home . . . At common law, the curtilage is the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life,' . . . and therefore has been considered part of the home itself for Fourth Amendment purposes . . . [C]ourts have defined the curtilage . . . by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private." *Oliver*, supra at 180.

Applying the "expectation" criteria to the garden in this case, I would conclude that the residents had a legitimate expectation that it would be constitutionally free from warrantless intrusion by government officers. The fact that contraband was in the garden does not alter the legitimacy aspect of the expectation of privacy; if it did, then no warrant would be necessary for even a home in which there was contraband. A resident's personal gardening, in a small plot close to his home and shielded from public view, comes within the activity described above. Otherwise warrantless searches could be made of backyards and other areas close to the house just because they were uncovered areas. But as said in *Oliver*, supra at 180, fn. 11: "It is clear . . . that the term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage." In *Meeks*, supra, we held that the particular gardens involved were encompassed within the warrant authorizing a search of the curtilage.

That, however, does not end the inquiry as to whether the seizure in this case was lawful. In my opinion, it was.

The officers had gone to the residence to talk to Gravley about the tip. They saw him look at them through the window and were told that he would come out of the house to see them. They waited and then learned that he had gone to the barn. One went to the barn to speak with him and, through the open hallway in the barn, saw a male moving rapidly from place to place behind the barn. Still seeking Gravley, the officer went around to the back of the barn and there saw Gravley pulling marijuana plants out of the vegetable garden and throwing them over the barbed wire fence.

When this occurred, the officer was in a legitimate position of observation. He had made a prior valid intrusion on the premises to

investigate the tip by seeking to talk to the resident. *State v. Brooks*, 160 Ga. App. 381 (287 SE2d 95) (1981). He had not violated that circumscribed intrusion by entering the house uninvited or going anywhere other than the place outside the house to which he was directed in order to fulfill a lawful task. If an officer may approach the outer door of a dwelling in order to make legitimate contact with the citizenry, as recognized in *Gilreath v. State*, 247 Ga. 814, 819 (279 SE2d 650) (1981), and may enter a storage room in a carport adjacent to the dwelling to look for a person he sought to arrest, *Reed v. State*, 163 Ga. App. 233 (293 SE2d 469) (1982), surely he may follow a person he knows is aware he wants to speak with him, to the place on the premises outside the home itself to which the person goes. Similarly to the state of affairs in *State v. Lyons*, 167 Ga. App. 747 (307 SE2d 285) (1983), the prerequisites for a "plain view" seizure were present and authorized it.

I am authorized to state that Presiding Judge Deen joins in this special concurrence.

SOGNIER, Judge, dissenting.

I respectfully dissent. First, *Oliver v. United States*, 466 U. S. 170 (104 SC 1735, 80 LE2d 214), relied upon by the majority, has no application to property within the curtilage, and the majority recognizes that the garden here was within the curtilage. *Oliver* does nothing more, or less, than iterate the "open fields" doctrine enunciated by the Supreme Court in *Hester v. United States*, 265 U. S. 57 (44 SC 445, 68 LE 898). This is clear from the following statement in *Oliver*: "[T]he rule of *Hester v. United States*, supra, that we reaffirm today, may be understood as providing that an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home." Id. at 178. *Oliver* then defines an open field as "any *unoccupied* or *undeveloped* area *outside of the curtilage*." (Emphasis supplied.) Id. at 466 U. S. 180, fn. 11. Since the garden in question here was neither in an unoccupied or undeveloped area, nor outside the curtilage, *Oliver* is not applicable to the facts of this case, and makes no change in the rule that property *within* the curtilage is protected by the Fourth Amendment.

Secondly, the majority statement that the garden was open to casual view is unsupported by any evidence of record. The garden was 70 to 80 yards behind appellants' residence, and could only be reached by going to the rear of the residence, past a shed, and through the barn; it could not be observed by a passerby or from the air. In fact, the only State witness testified that he could not see the marijuana growing until he was at the edge of the garden itself. Nor is there any evidence to support the majority statement that police or

passersby could have approached from a different direction where the garden was open to view. Not only is this mere speculation, but the exhibits in the case controvert such a conclusion. Thus, the majority's attempt to analogize the factual situation here with someone who plants marijuana in a flower garden in their front yard, exposed to the view of a casual passerby, is unwarranted by the facts in this case.

The "plain view" doctrine (see *Coolidge v. New Hampshire*, 403 U. S. 443 (91 SC 2022, 29 LE2d 564)), does not occur until a *search* is in progress, id. at 467, and the State's only witness testified that he was not conducting a search. Further, the case does not fall within the "plain view" doctrine because the officer had intruded within the curtilage before he saw the marijuana. *Bunn v. State*, 153 Ga. App. 270, 275 (2) (265 SE2d 88) (1980). A barn 70 or 80 yards from the house is within the curtilage, *Norman v. State*, 134 Ga. App. 767, 768 (1) (216 SE2d 644) (1975), and the fact there is no fence is immaterial. "*Prima facie*, a search made within the curtilage of the owner without a warrant is unconstitutional and void." (Emphasis supplied.) *Bunn*, supra at 272. Here the officer had no warrant and no probable cause to search, but went to appellants' residence on a second hand tip that appellant Gravley "may be" growing marijuana in his garden. "The intrusion by police officers into the curtilage, without probable cause to search or arrest, without a warrant, and without exigent circumstances, rendered the subsequent seizure invalid." *Bunn*, supra at 275.

In regard to the fact that the deputy saw some "unusual activity" in the garden, this raised no more than a suspicion in the deputy's mind, and "suspicion" is not a valid ground for a search. *Wong Sun v. United States*, 371 U. S. 471, 479 (83 SC 407, 9 LE2d 441). Nor can "unusual activity" be equated to a situation where a police officer sees a crime being committed in his presence, since unusual activity does not equate to a crime.

Lastly, to adopt the rule enunciated by the majority would eliminate the need for police officers to obtain a search warrant before intruding upon a person's curtilage, and give police the right to roam over the curtilage at will, seizing any contraband or evidence that is not completely hidden from view. I do not believe this is the rule under existing law and hopefully, it shall never become the law. The Supreme Court of the United States has stated that "[a]bsent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police . . . The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals." *McDonald v. United States*, 335 U. S. 451, 455-456 (69 SC 191, 93 LE 153). No "grave emergency" existed here, since the officer only went to appellants' residence to talk to Gravley.

For the foregoing reasons, I find the intrusion into the curtilage

here was without probable cause to search or arrest, without a warrant, and without exigent circumstances; hence, the seizure was illegal. *Bunn*, supra. Accordingly, I would reverse on the ground that the seizure was unlawful and unjustified under any existing theory of law.

I am authorized to state that Chief Judge Banke and Judge Benham join in this dissent.

### On Motion for Rehearing.

On motion for rehearing, we have reexamined the evidence and related arguments pertaining to the asserted illegal search and seizure once again advanced and renewed on behalf of both Botts and Gravley. We are satisfied that our original disposition of this issue was correct and will adhere thereto.

In relation to Case No. 72952, *Botts v. State*, appellant Botts contends that in our opinion we ignored prosecutorial misconduct in that during examination by the district attorney of one of the arresting officers concerning the officer's observations of Ms. Botts at the scene of her arrest, the officer testified to her silence after she had been given *Miranda* warnings. Botts contends that such questioning has been condemned by this court in *Phillips v. State*, 165 Ga. App. 235 (299 SE2d 138) and *Lowe v. State*, 136 Ga. App. 631 (222 SE2d 50).

The facts in the *Botts* case reflect that shortly after the police officers arrived to talk with Gravley, Botts left the residence in an automobile. About 10-15 minutes later, she returned and sat on the front porch of the residence. She observed the police officers escorting Gravley with his hands cuffed behind his back toward a police car. Though disputed, it appears that Gravley called out in a loud voice to Botts words to the effect that she should say nothing until they had seen an attorney. After Gravley had been removed from the scene in a police vehicle, the officers continued to look for other marijuana that might be growing on the premises. After the inspection was completed, one of the officers walked to where Ms. Botts was seated and advised her of her *Miranda* rights. He then told her that he would not arrest her at that moment but that he would take out a warrant for her arrest for growing and possessing marijuana. Because she had small children, he told her when it was convenient and later on during that day she should appear at the sheriff's office with a bondsman and surrender herself on the marijuana charge and she would be allowed to make bond.

After the district attorney had elicited the above information, he inquired of the police officer as to whether Ms. Botts had registered any emotional or facial surprise or other manifestation of emotion. The officer stated Ms. Botts remained neutral in expression and ac-

tions.

When this evidence was elicited, the defense objected that the answer called for a conclusion or an unsupported opinion. Later in redirect examination, the same subject was pursued by the defense counsel.

On the next day (the second day of trial), counsel for the first time and citing *Phillips* and *Lowe*, supra, contended that the questioning concerning Ms. Botts' expressions and actions violated her *Miranda* right by attempting to breach her right to remain silent.

We find no *Miranda* violation under these circumstances. Both *Phillips*, supra and *Lowe*, supra, involved situations where the defendant, after having been advised of the right to remain silent, was asked specifically why he did not verbally respond by way of explanation when confronted with an incriminating situation. Thus in both *Phillips* and *Lowe*, the court was dealing with reference to a failure of a testimonial response, and thus a direct reference to the suspect's verbal silence in the face of an inculpating situation.

In this case, the only thing presented was a third party's physical observation of Ms. Botts. No verbal or mental response by Ms. Botts was elicited by way of question. She was not asked to make any statement nor to explain any situation. This is tantamount to an expert testifying to the alcoholic content of blood properly drawn or a suspect being able to wear an incriminating garment or fit his foot into a foot impression. Other examples are a police officer's observations of intoxication at the time of confrontation on testimony that when confronted the suspect fled. These latter situations, while incriminating, have never been deemed violative of *Miranda* rights for none involve testimonial nor coerced admissions by a suspect. *Creamer v. State*, 229 Ga. 511, 516-517 (192 SE2d 350); see *State v. Armstead*, 152 Ga. App. 56 (1) (262 SE2d 233).

One critical issue in the case of *Botts* involved whether she had a proprietary interest in the garden and was knowledgeable of the contents of the garden sufficient to sustain her guilt of possessing and growing marijuana. She denied knowing what was growing in the garden though she admitted she lived on the premises and she was aware that her live-in companion Gravley may well have used marijuana. That she voluntarily exhibited by facial expression or action not amounting to words no surprise that marijuana was found growing in the garden was very relevant in relation to the jury's determination of her knowledge.

Though this issue was not previously addressed, we find no merit in the enumeration of error and adhere to our affirmance of conviction in relation to Ms. Botts.

*Rehearing denied.*

CARLEY, Judge, concurring specially.

I have serious reservations with regard to the majority's resolution of the issue discussed "On Motion for Rehearing." The prosecutor's inquiry into appellant Botts' post-*Miranda* reactions would appear to be much more extensive than the majority intimates. Likewise, the distinction drawn by the majority between the lack of a verbal response to being arrested and the lack of an emotional response to that event would appear to be tenuous at best. However, notwithstanding my reservations as to the merits, I do not believe that the issue has been preserved for appellate review. Our Supreme Court has held that it is incumbent upon the defendant in a criminal case to object to the State's elicitation of such testimony as was given in the instant case. See *Alderman v. State*, 241 Ga. 496, 504 (246 SE2d 642) (1978). In this case, although there was *an* objection at the time the testimony was elicited by the State, the objection was not that the inquiry constituted an impermissible infringement upon appellant Botts' constitutional right to remain silent. That ground was not raised until defense counsel moved for a mistrial on the second day of the trial, long after the testimony had already been admitted. Under these circumstances, the issue has not been preserved for appellate review. "[T]here was no objection to the [testimony] that became the subject of the motion for mistrial on the ground that it [was an impermissible comment on] the appellant's [Fifth Amendment rights] at the time the [testimony] was [allowed] into evidence. '(A) mistrial will not lie where evidence is admitted without objection. ([cit.]) and a motion for mistrial not made contemporaneously with the alleged misconduct makes the motion not timely. [Cit.]' [Cit.]" *Flynn v. State*, 255 Ga. 415, 418-419 (6a) (339 SE2d 259) (1986). Accordingly, although I cannot concur in the majority's finding of no error, I do not believe that reversal of appellant Botts' conviction is required.

DECIDED DECEMBER 4, 1986 —
REHEARING DENIED DECEMBER 19, 1986 — 

*H. Michael Bray*, for appellants.
*Rafe Banks III, District Attorney, Garry T. Moss, Assistant District Attorney*, for appellee.