## A00A1538. WILLIAMS v. THE STATE.
### (547 SE2d 395)

ELDRIDGE, Judge.

A Floyd County jury found Clyde Tony Williams guilty of possession of cocaine with intent to distribute. Williams appeals by challenging (1) the trial court's order denying his motion to suppress, and (2) the sufficiency of the evidence demonstrating intent to distribute the cocaine in his possession. Upon careful review of the errors as enumerated, we affirm Williams' conviction.

The evidence, viewed to uphold the verdict,[1] shows that Officer Tim Smith with the Rome Police Department was on routine patrol at 1:08 a.m. He saw Williams sitting in a chair in his driveway right next to the sidewalk. Williams' residence is on the corner of Pennington Avenue and Grover Street, which has been identified as a high drug sale area. Officer Smith had previously arrested Williams twice for drug-related offenses within a couple of blocks of the corner. The chair in which Williams was sitting was beside the front passenger wheel of a broken down Chevrolet Caprice that sat in the driveway with its front end parked inches from the public sidewalk. Williams was wearing a leg monitor pursuant to his parole status.

Officer Smith stopped his vehicle:

I got out, approached him, asked him what was going on. He [Williams] jumped up out of his chair and said, "What am I doing, Smith? I ain't done nothing. I ain't done noth-

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); *Popham v. State*, 214 Ga. App. 775, 777 (449 SE2d 150) (1994).

ing. . . ." He said, "I ain't got nothing. I ain't done nothing. What have I done? I ain't got nothing on me." He [Williams] reached in his pocket and pulled out a big handful of money and put it back in his pocket. "I ain't got nothing."

At the very beginning of this exchange, Officer Glaze approached to back up Smith; Glaze heard Williams' protestations and saw him pull the money out of his pocket. In the middle of the exchange, Officer Bartley arrived as backup, and Smith told him what was occurring; Bartley told Smith that he had seen Williams sitting beside the Caprice since 4:00 that afternoon, some nine hours earlier.

Williams was "very excited, very nervous. . . . He was pretty much, almost jumping around excited." Officers Glaze and Bartley began to shine their flashlights around the yard, while Smith asked Williams what was wrong; Smith was "focused on Mr. Williams. Due to the fact that he was so nervous." During the entire encounter, the officers stayed near the sidewalk where the Caprice was parked and Williams was standing; the officers remained "in the same general area as the whole incident started out at, in a few feet one way or the other."

Shortly after the encounter began, officers Glaze and Bartley bent down and shined their lights under the Caprice from the driver's side. In plain view, the officers saw a plastic bag containing 40 hits of crack cocaine. The bag was located under the car on the inside of the passenger side tire, where it could be accessed from the chair in which Williams was sitting.

The entire encounter lasted five minutes or less. During that time, Williams was not detained and was "free to go at any time." He never asked the officers to leave and left himself only for 15 seconds to go up onto the porch, remove the money from his pocket, and return. The encounter remained voluntary the entire time.

Prior to trial, Williams filed a motion to suppress the cocaine. After receiving evidence thereon, the trial court found, inter alia:

> Now those drugs, as it was described from the witness stand and as I looked at those photographs, could just as easily have been seen by an officer standing, squatting, kneeling on the public sidewalk, because that car and the front end of the car was hanging over by inches the public sidewalk. My general recollection is that those sidewalks — that the public right-of-way for those sidewalks is a little bit wider than the paved portion itself, but the car actually overhung the paved portion of a public sidewalk and it was level and the car sat on a concrete pad. There was nothing that would have prevented an officer from looking under the front end

of the car from a public viewing point and seeing these drugs having seized them. It seems to me that the law is not so unreasonable and we're talking about unreasonable searches and seizures.

*Held*:

1. Williams first challenges the trial court's denial of his motion to suppress, claiming that the search under the Caprice violated his Fourth Amendment right to be free from unreasonable searches and seizures. In that regard,

(a) The contact between the officers and Williams appeared to be a first tier voluntary encounter, which lasted less than five minutes. Williams was at his home, was not detained, and was free to come and go. Williams never ordered the officers out of his yard but continued to stand in his yard and talk to them.

Even were this not the case, Williams' known history of selling drugs within two blocks of the area in question, i.e., his home; his presence from 4:00 p.m. to 1:08 a.m. alone in a chair in his driveway beside a car on a street corner known for heavy drug sales; the presence of a large amount of cash in Williams' pocket; his extreme nervousness at the approach of the officers; and his abruptly volunteered assertions that "What did I do? I ain't got nothing on me," are sufficient to provide reasonable articulable suspicion that Williams might be engaged in drug sales so as to permit an investigative detention and questioning. Thus, the officers were validly in Williams' yard.

(b) There was no search in violation of the Fourth Amendment.

(i) Since the officers had a right to be in the yard in order to investigate, the police did not improperly intrude into a constitutionally protected area, and laws regarding curtilage in relation to a lawful search are not germane.[2] Thus, Williams' reliance on our decision in *State v. O'Bryant*[3] is misplaced, because that case turned on the fact that officers had no valid reason to remain within the curtilage of the property in question after ascertaining that the owners were not home.

Moreover, if the laws regarding curtilage were applicable, such questions should be resolved with reference to four factors:

the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area

---

[2] *Smith v. Maryland*, 442 U. S. 735, 741 (99 SC 2577, 61 LE2d 220) (1979).
[3] 219 Ga. App. 862, 863 (467 SE2d 342) (1996).

is put, and the steps taken by the resident to protect the area from observation by people passing by.[4]

Here, Williams' front yard and driveway are on a corner of two public streets immediately connected to a public sidewalk and road. The small front yard and driveway can be easily seen in their entirety from the sidewalk. The yard and driveway are open to be walked upon or cut through by any passersby, and no steps have been taken to protect the area in any way from view or access. Under such circumstances, there can be no constitutionally protected right to privacy or reasonable expectation of privacy in any items exposed to the naked eye in either Williams' driveway or front yard. The Fourth Amendment protects only against unreasonable searches.

> The Fourth Amendment . . . has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point *where he has a right to be* and which renders the activities clearly visible.[5]

What a person exposes to the public is not a subject of Fourth Amendment protection. "In substance then, we conclude that where one exposes to open view that which is contraband, he forfeits his right to any reasonable expectation of privacy."[6]

(ii) There was no Fourth Amendment violation because the officers shined their flashlights around Williams' yard.

> It is likewise beyond dispute that [the officers'] action in shining [their] flashlight to illuminate [Williams' yard and driveway] trenched upon no right secured to the latter by the Fourth Amendment. . . . [Cit.] "(T)he use of a searchlight is comparable to the use of a marine glass or a field glass. It is not prohibited by the Constitution." Numerous other courts have agreed that the use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.[7]

---

[4] *United States v. Dunn*, 480 U. S. 294, 301 (107 SC 1134, 94 LE2d 326) (1987); *Espinoza v. State*, 265 Ga. 171, 173 (454 SE2d 765) (1995).

[5] (Emphasis supplied.) *California v. Ciraolo*, 476 U. S. 207, 213 (106 SC 1809, 90 LE2d 210) (1986).

[6] *Gravley v. State*, 181 Ga. App. 400, 404 (352 SE2d 589) (1986).

[7] *Texas v. Brown*, 460 U. S. 730, 739-740 (103 SC 1535, 75 LE2d 502) (1983); *United States v. Dunn*, supra at 304-305. See also *Galloway v. State*, 178 Ga. App. 31, 35 (342 SE2d 473) (1986).

One cannot claim that cover of darkness precludes seeing what daylight would expose to plain view.

(iii) There was no Fourth Amendment violation because the officers had to bend down to see the contraband under the Caprice.

> Likewise, the fact that [the officer] changed his position and bent down at an angle so he could see what was [under Williams'] car is irrelevant to Fourth Amendment analysis. The general public could peer [under Williams'] automobile from any number of angles; there is no reason [the officer] should be precluded from observing as an officer what would be entirely visible to him as a private citizen. There is no legitimate expectation of privacy shielding that portion [under] an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers. In short, the conduct that enabled [the officer] to observe [under Williams'] car . . . was not a search within the meaning of the Fourth Amendment.[8]

(iv) There was no Fourth Amendment violation when Officer Glaze seized the contraband in plain view under the car.

Officer Glaze's testimony was "at first I didn't think it was *what I thought it was*, but then I got a closer look at it and it was a plastic bag with suspected crack in it." Glaze suspected the plastic bag contained crack from the time he first saw it, but looked closer. He testified that he had been trained to identify drugs, had seen crack cocaine before, and he suspected the plastic bag he saw under the car was crack cocaine. From this evidence, it is plain that Officer Glaze had probable cause to seize the plastic bag he saw in plain view under Williams' car.[9]

(v) There was no Fourth Amendment violation simply because Officer *Smith* was not certain that someone looking under the car from a public sidewalk could have seen the drugs. Officer Smith did not find the drugs. Officers Glaze and Bartley did. And Bartley testified that the drugs were located underneath the car near the inside of the passenger side tire, where, as the trial court determined, they could be seen by an officer looking down the length of the car from the front end.

It is urged that the trial court's conclusion the drugs could be seen from the public sidewalk is clearly erroneous because the trial court stated "that car and the front end of the car was hanging over by inches the public sidewalk," while the photographic exhibits show

---

[8] (Citations and punctuation omitted.) *Texas v. Brown*, supra at 740.
[9] Id. at 742-743.

that no part of the car hung over the public sidewalk. However, this argument ignores the actual substance of the trial court's findings, which was that an officer could see the drugs underneath the car from the sidewalk, because the front end of the car was so very close to the sidewalk. The issue is not, then, whether the front end was "hanging inches over" or "recessed inches away" from the sidewalk. The issue is whether the drugs could be seen underneath the car from the sidewalk. The photographic exhibits clearly support the trial court's factual determination that anyone could easily stand on the sidewalk, bend over, look under the front end, and see the contraband underneath the car. From the photographs it is clear that, if the front end is not actually "hanging inches over the sidewalk," it is too close to doing exactly that for the trial court's factual determination to be "clearly erroneous." When an appellate court reviews an order on a motion to suppress evidence, it must construe the evidence most favorably to upholding that order; the trial court should resolve conflicts in the evidence, and its credibility and factual findings should not be disturbed on appeal unless they are clearly erroneous.[10] In this case, the trial court made considered, detailed, and thoughtful findings of fact from which to base proper conclusions of law. The court specifically found that Williams and his family were not credible with regard to the police encounter: "it makes it more believable for me that the police version is what happened than what Mr. Williams' family said." The court found that the officers had reasonable articulable suspicion to detain Williams for questioning; that they then had a right to be in the yard; that shining their flashlights around the yard and under the car was not unreasonable; and that the drugs were in plain view under the car from both the yard and the sidewalk. The trial court's findings are supported by the facts. Accordingly, there was no error in denying Williams' motion to suppress.

2. Williams contends there was no evidence to demonstrate he possessed the requisite intent to distribute the crack cocaine found under the Caprice. We disagree.

Williams' prior conviction for sale of cocaine two blocks from the incident locale was admitted to demonstrate his bent of mind and intent to distribute with regard to the instant case. That coupled with evidence that Williams had been sitting alone on the corner of a high drug sale area for nine hours straight, from 4:00 p.m. to 1:08 a.m.; had a large amount of cash in his pockets; was within reaching distance of 40 hits of crack cocaine; and was in possession of no paraphernalia for ingesting crack cocaine is sufficient evidence for a rational trier of fact to find beyond a reasonable doubt that Williams

---

[10] *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

was in possession of the drugs with the intent to distribute them.[11]

*Judgment affirmed. Pope, P. J., Johnson, P. J., and Smith, P. J., concur. Blackburn, C. J., Barnes and Phipps, JJ., dissent.*

BARNES, Judge, dissenting.

I respectfully dissent. The "plain view" doctrine cannot be used to justify the search and seizure in this case because the officers invaded the curtilage of Williams' home for no legitimate reason and searched it without a warrant. "Prima facie a search made within the curtilage of the owner without a warrant is unconstitutional and void. Curtilage includes the yards and grounds of a particular address, its gardens, barns, buildings, etc." (Citations and punctuation omitted.) *Bunn v. State*, 153 Ga. App. 270, 272 (2) (265 SE2d 88) (1980). A person's driveway and a car parked on the driveway fall within the curtilage of his home and are entitled to the protections of the Fourth Amendment. *State v. O'Bryant*, 219 Ga. App. 862, 864 (467 SE2d 342) (1996).[12]

The officers in this case entered Williams' yard for no legitimate reason. Although I agree that the first officer on the scene, Officer Smith, had a right to stand on the public sidewalk and talk to Williams, the other officers had no justifiable reason to enter Williams' property and begin a search.[13] Neither of these officers came to the property to talk with Williams; instead, they stopped of their own accord to provide backup to the first officer and then immediately conducted a search of his front yard and the area underneath a car in his yard. They initiated this search as a matter of "habit" or "routine" because Williams was nervous. While it was perfectly appropriate for them to stop to provide officer backup, there was no legitimate rea-

---

[11] *Guild v. State*, 234 Ga. App. 862, 870 (10) (b) (508 SE2d 231) (1998).

[12] The majority uses the four factors outlined in *United States v. Dunn*, 480 U. S. 294 (107 SC 1134, 94 LE2d 326) (1987), and *Espinoza v. State*, 265 Ga. 171 (454 SE2d 765) (1995), to conclude that Williams had no constitutionally protected right to privacy. However, those factors were created to assist a court in determining the extent of a home's curtilage, not to find that a person has no expectation of privacy in an area that is without question part of the home's curtilage.

[13] The majority's description of the scope of the search warrants further explanation. Officer Smith testified that he believed he was standing on the sidewalk when he talked with Williams and that they (he and Williams) "were always in the same general area as the whole incident started out at, in a few feet one way or another." Officer Bartley testified that he believed Officer Glaze "was around the yard looking" when he arrived on the scene. He then joined "Officer Glaze in searching around the yard." He and Glaze also searched the area of the yard on the opposite side of the car from where Williams was standing. Officer Glaze testified that he searched "around the vehicle, around the grass, [and] around the trees" for about five minutes. This area "was anywhere in between a length of car, something like that." Finally, the trial court found that the police found the contraband while they were standing on the defendant's front yard.

son for them to enter and search Williams' property.[14]

Since the contraband was found *after* they illegally entered Williams' property, the plain view doctrine does not apply. *Bunn*, supra, 153 Ga. App. at 275 (plain view doctrine did not apply because "the officers had intruded within the curtilage before they saw the articles hidden behind the air conditioner"). Speculation that the police "might" have seen it from a public place does not alter the fact that the police illegally searched Williams' property and actually found the contraband as a result of that illegal search. As the United States Supreme Court recognizes, "[i]t is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U. S. 128, 136 (110 SC 2301, 110 LE2d 112) (1990).

Adoption of the majority's analysis in this case gives the police the right to roam over a person's property at will and search for any contraband or evidence that is not completely hidden from view. It will also allow the police to enter our yards and peer into our bedroom windows. This is precisely what our Constitution was designed to prevent, and I would accordingly reverse the trial court's denial of Williams' motion to suppress.

I am authorized to state that Chief Judge Blackburn and Judge Phipps join in this dissent.

DECIDED MARCH 30, 2001 —
RECONSIDERATION DENIED APRIL 12, 2001 ▮▮▮▮▮▮

*Karen S. Wilkes*, for appellant.
Clyde T. Williams, *pro se.*
*Tambra P. Colston, District Attorney, John F. McClellan, Jr., Assistant District Attorney*, for appellee.

---

[14] The majority concludes that "the officers had a right to be in the yard to investigate," but fails to state what the officers were investigating in the yard. Officer Glaze, one of the officers who searched the yard testified, "We weren't in there investigating him or anything like that." The other officer who searched the yard, Officer Bartley, testified that he had no previous information as to what the other officers were investigating when he arrived and that he assisted "by joining Officer Glaze in searching through the yard."